## COLUMBUS, S. & H. R. CO. APPEALS.

CARLISLE et al. v. MERCANTILE TRUST CO. et al. McCUNE v. SAME
(two cases). STEWART v. SAME. LITTLE et al. v. SAME. METRO-
POLITAN TRUST CO. v. SAME. HALLETT v. SAME. SINKS v.
SAME. PARROTT et al. v. SAME. METROPOLITAN TRUST
CO. et al. v. SECOND NAT. BANK et al. MERCANTILE
TRUST CO. v. SECOND NAT. BANK OF
SANDUSKY et al.

(Circuit Court of Appeals, Sixth Circuit. May 7, 1901.)

Nos. 867, 859, 862, 860, 863, 908, 909, 861, 864, 870, 907.

1. RAILROADS — RIGHTS OF BONDHOLDERS — RESCISSION OF REORGANIZATION
AGREEMENT.
Bondholders of an insolvent railroad company, who unite with other
bondholders and stockholders for the protection of their mutual interests
in forming a new company to purchase the property of the old at fore-
closure sale, and, in accordance with the reorganization agreement,
exchange their bonds for bonds of the new company, secured by a mort-
gage expressly subject to a first mortgage made to secure an issue of
bonds to be used as provided in the reorganization agreement to take
up certain trust certificates and floating indebtedness of the old com-
pany which the new company agrees to assume, have no standing to
ask the rescission of the agreement and a restoration of the lien of the
old bonds, which would give them a priority over certain of their asso-
ciates, after such agreement has been executed by the purchase of the
property, the cancellation of the old mortgages, and the payment of a
large part of the assumed indebtedness, and after the new company has
become insolvent, merely because the bonds set apart for that purpose
proved insufficient to pay all of such indebtedness, or could not be
utilized for that purpose, and where there has been no fraud or conceal-
ment to entitle them to such rescission.

2. INTEREST—COUPONS ATTACHED TO RAILROAD BONDS—NEW YORK STATUTE.
Where principal and interest of railroad bonds are payable in New
York, in the absence of provision otherwise they are governed by the
statutes of that state relating to interest, and under such statutes in-
terest is not recoverable on coupons which remain in the hands of the
holder of the bonds, from which they have not been detached.

3. RAILROADS—REORGANIZATION AGREEMENT—CONSTRUCTION AND EFFECT.
A reorganization agreement between the stockholders and bondholders
of an insolvent railroad company, providing for the organization of a
new company to purchase the property of the old at foreclosure sale,
where the old company was unable to continue as a going concern, and
such sale was inevitable, is not an agreement for the sale and purchase
of the property, which created the relation of vendor and purchaser be-
tween the old company and the new, and imposed on the latter a liability
for the debts of the former as its successor.

4. SAME—ASSUMPTION OF DEBTS OF OLD COMPANY—LIEN.
The stockholders and bondholders of an insolvent railroad company
entered into an agreement providing for the organization of a new com-
pany to purchase the property of the old at foreclosure sale, which was,
in any event, inevitable, because of the inability of the old company to
continue as a going concern. The agreement provided that the new
company should execute a first and second mortgage securing issues of
bonds, the first mortgage to be a first lien on the property purchased,
and the proceeds of the bonds secured thereby to be used in making
improvements on the property, and in paying certain debts of the old
company, including its floating indebtedness, which the new company
should assume. The second mortgage bonds were to be exchanged for

109 F.—12

the bonds of the old company so far as the holders consented to make such exchange, those not consenting to be paid in cash their proportionate share of the proceeds realized from the sale of the property. The agreement was carried out, except that certain of the debts of the old company, including a part of its floating indebtedness, were not paid. *Held*, that such agreement of assumption did not operate to give the holders of such floating indebtedness an equitable lien on the property in the nature of a vendor's lien, which they could enforce as superior to the mortgages, nor a special lien on the first mortgage bonds still held by the company, no particular bonds having been set apart for their payment.

5. SAME—LABOR CLAIMS—RIGHT OF ASSIGNEE TO PREFERENCE.

The right of preference attaching to a labor claim against an insolvent railroad company inheres in the claim itself, and not in the claimant, and passes with the claim to an assignee.

6. SAME—RECEIVERS' CERTIFICATES—LIEN.

Receivers' certificates, issued by authority of an order entered in a railroad foreclosure suit, after the entry of a decree for sale of the property plainly contemplating such sale free from liens, which order provided that the certificates should be paid out of the earnings of the receivership "or out of the proceeds of the sale of such property when the same is sold, after the payment of the costs," do not constitute a lien on the property after sale, in the hands of the purchaser, but are a charge only upon the proceeds of the sale, and the holders must depend for their ultimate rank and payment upon the final decree made in the cause wherein they were issued.

7. SAME—FORECLOSURE SALE—EFFECT OF REQUIRING SPECIAL SECURITY FOR PURCHASE MONEY.

A court in a railroad foreclosure suit confirmed a sale of the property to a reorganization committee representing a new company organized by the stockholders and bondholders of the old company, and directed a deed made conveying the property in "fee simple" to the purchasers. Only a small part of the purchase money had been paid, and there was outstanding a large amount in claims entitled to preference over the mortgages foreclosed, including receivers' certificates issued by authority of the court, and expressly made a charge on the proceeds of the sale, to the amount of $500,000, but the full amount of such preferred claims had not then been determined. The decree of confirmation, however, did not provide for retaking and reselling the property, but, on the contrary, expressly provided that the purchasers or their assigns should execute a "first mortgage" on the property, securing bonds not exceeding $2,000,000 in amount, and should deposit in court $800,000 in such bonds, to secure the payment of such preferred claims as should thereafter be directed by the court. The new company to which the property was conveyed executed the mortgage and deposited the bonds as so required. Subsequently, by direction of the court, the receiver turned over to the purchasers some $300,000 of assets and cash in his hands, without objection on the part of the holders of the preferred claims, but the amount of such preferred claims was never adjudicated, and the bonds deposited remained in court until the new company became insolvent and foreclosure proceedings against it were commenced in another court. *Held*, that the terms of the court's decree, acquiesced in by all parties in interest, were inconsistent with the retention of any lien on the property sold for the unpaid purchase money in behalf of the holders of the preferred claims, which could be enforced by the court in the subsequent foreclosure suit, but that the holders of the receivers' certificates were restricted to a lien upon the bonds deposited as special security, in which they must share pro rata with other preferred creditors thereby secured; and that such bonds ranked equally, but without preference, with the other bonds of the same series issued and sold by the company.

8. SAME—PRIORITY OF MORTGAGES.

A railroad company, which had given a mortgage covering all its after-acquired property, purchased certain land, paying the consideration

therefor and causing the title to be conveyed to a naked trustee. It then built machine shops on the land, and afterwards executed a second mortgage covering all its property and interests, both legal and equitable. It subsequently issued notes, which it caused to be secured by a mortgage on the shop property executed by the trustee. *Held*, that such mortgage was junior to both of the prior mortgages given by the company, the purchasers of the notes being charged with notice of the condition of the title to the mortgaged property by the open and notorious possession of the railroad company, and the fact that such notes were executed by that company.

9. SAME—PURCHASE BY REORGANIZED COMPANY—SUBROGATION AS AGAINST UN-FORECLOSED JUNIOR MORTGAGE.

A reorganization agreement, in which stockholders and bondholders of an insolvent railroad company unite for their own protection to form a new company to buy the property of the old company at a foreclosure sale, which is inevitable, notwithstanding it provides that the new company shall assume and pay all the debts of the old, does not constitute the new company the primary debtor as to such debts, so that, after it has purchased the property, and paid the foreclosed mortgages by exchanging its own mortgage bonds for those thereby secured, it is precluded from preserving the lien of such mortgages for its protection and that of its bondholders against a junior mortgagee, who was not a party to the suit; and such junior mortgagee, who has refused to come in under the agreement, although given an opportunity to do so, and to receive bonds equal in rank to those accepted by his senior lienholders, has no equity to invoke its provisions to defeat their prior equitable rights, and advance his mortgage to a first lien.

10. SAME—PRIORITY OF MORTGAGES—ESTOPPEL BY RECITALS.

A railroad company, which had succeeded by purchase at foreclosure sale to the property of a former company and to the rights of the foreclosed mortgagees, executed a second mortgage, which provided that certain of the bonds secured thereby should be reserved to be used for the payment by exchange or otherwise of a first mortgage, and also an unforeclosed mortgage executed by its predecessor. It also covenanted that upon the payment of such two mortgages it should become a first lien upon "all and singular" of the company's property. The unforeclosed mortgage mentioned covered only a part of such property, upon which it was superior in lien to certain of the mortgages foreclosed, but junior to others. *Held*, that such provisions did not constitute an admission or recognition that such old mortgage was a superior lien upon the property, which estopped the bondholders from claiming the right to be subrogated to the standing of such of the foreclosed mortgages as were superior to it in a general foreclosure suit, but were intended merely as a covenant with the bondholders that on payment of such mortgage and the other named they should have absolutely the first lien upon all the property.

11. SAME—PRIORITY OF LIENS.

An individual advanced the money to pay for certain terminal property purchased for a railroad company, taking the title to himself as security. He borrowed the money from a bank, giving his note therefor. Subsequently, for the sole purpose of reducing his apparent indebtedness to the bank, a construction company, which was in fact identical with the railroad company, executed its note to the bank, which he indorsed, and secured by a mortgage of the property. *Held*, that such change in the form of the obligation did not operate as a payment to him, so as to extinguish his right to a first lien on the property for the amount of his advances, as against mortgagees of the railroad company, who were charged by the condition of the title with notice of his rights.

12. ESTOPPEL—GROUNDS.

An estoppel in pais does not arise from the conduct or silence of one party to a transaction where the other party was not misled, and suffered no injury therefrom.

On Rehearing.

1. EQUITY—REVIEW OF FINDINGS OF MASTER.
Findings of fact by a master are supported by a strong presumption of correctness, and will not be set aside or modified in the absence of clear evidence of mistake or error.

2. SAME—EXCEPTIONS TO FINDINGS—SUFFICIENCY.
Exceptions to a master's report must point out specifically the errors on which the party relies, to give the master an opportunity to see wherein his report is subject to objection, and to apprise the opposite party of just what he has to meet. General exceptions to findings of a master that all the bonds secured by a railroad mortgage had been duly issued and were valid in the hands of the several holders are not sufficiently specific to raise any question as to the validity of the bonds of any particular holder.

Appeals from the Circuit Court of the United States for the Southern District of Ohio.

These several appeals are from decrees upon separate interventions filed in a consolidated mortgage foreclosure suit against the Columbus, Sandusky & Hocking Railroad Company. Many questions arise upon this review, which involve the priority of the lien of mortgages under foreclosure. To a proper understanding of these issues, it becomes necessary to here state the origin and history of the mortgagor railroad company, and of the two mortgages under foreclosure. Both were executed by the Columbus, Sandusky & Hocking Railroad Company, a corporation of the state of Ohio. The senior of these bears date November 9, 1895, and was executed to secure an issue of. 5 per cent. coupon bonds, aggregating two millions of dollars, known as and called hereafter "Prior Lien Bonds." The trustee under this mortgage is the appellee the Mercantile Trust Company, a corporation of the state of New York. Default in payment of interest having occurred, the said trust company filed its foreclosure bill June 2, 1897, and secured the appointment of Samuel A. Felton as receiver. Since that time the railroad has been operated under the orders of the circuit court. The other mortgage under foreclosure bears date November 11, 1895, and was issued to secure an issue of bonds aggregating ten millions of dollars. This mortgage was made to the Metropolitan Trust Company of the city of New York. Default having been made in payment of interest, the trustee filed its dependent foreclosure bill in the court below. The receivership under the bill of the Mercantile Trust Company was extended to the new suit, and both suits were then consolidated under the name of "The Metropolitan Trust Co. v. The Columbus, Sandusky & Hocking Railroad Company and Others."

The property covered by these mortgages was originally owned by two distinct railroad companies, whose roads connected at Columbus. One of these was known as the Columbus, Shawnee & Hocking Railway Company, and the other as the Sandusky & Columbus Short-Line Railway Company. The property of the first-named constituent company was, while owned by that company, subjected to two mortgages. Under the senior of these, an issue of $3,728,000 in first mortgage bonds was secured. Under its second mortgage an issue of $708,000 in bonds was secured. The second of the original constituent companies subjected its railroad also to two mortgages. Under its first mortgage an issue of $3,000,000 of bonds was secured, and under the second an issue of $150,000 was secured. In December, 1893, these two Ohio railroads were consolidated, thereby forming the Columbus, Sandusky & Hocking Railway Company, which was the immediate predecessor of the present company, the Columbus, Sandusky & Hocking Railroad Company. This predecessor consolidated company (hereafter, for brevity, designated as the "Railway Company") executed a mortgage upon its entire line to secure an issue of $10,000,000, of which only $1,141,000.11 in bonds were, in fact, issued. Thus, prior to the acquisition of the railroad now owned by the Columbus, Sandusky & Hocking Railroad Company (hereafter designated as the "Railroad Company"), it had been subjected to five distinct mortgages by predecessor corporations, under each of which the Metropolitan Trust Company

was the trustee. In addition to these mortgages, the consolidated company, known as the "Railway Company," had created or assumed a large "car trust" and general "floating debt," the particulars of which need not now be given.

In June, 1895, the Railway Company was hopelessly insolvent. In this state of affairs, a foreclosure being inevitable, an agreement for united action by the bondholders and stockholders was proposed for the protection of their own interests by the purchase of the property at the foreclosure sale by a new company to be organized by such bondholders and stockholders as should agree to the plan for a reorganization. As this plan or agreement is of supreme importance in the determination of the greater part of the questions here to be considered, it is set out here in full, as follows:

"Columbus, Ohio, June 11, 1895.

"Whereas, on or about July 1, 1895, it is proposed to incorporate and organize the Columbus, Sandusky & Hocking Railroad Company with a capital stock which shall be, at its organization, or shall be increased to, not exceeding eleven million six hundred thousand dollars ($11,600,000), of which capital stock not to exceed four million one hundred thousand dollars ($4,100,000) thereof shall be noncumulative four per cent. (4 per cent.) preferred stock, and the remainder common stock.

"Preferred Stock.

| | |
|---|---|
| Authorized amount | $4,100,000 |
| For purchase present C., S. & H. preferred stock | 4,041,067 |
| Surplus preferred stock in treasury | $    58,933 |

"Common Stock.

| | |
|---|---|
| Authorized | $7,500,000 |
| For purchase present C., S. & H. common stock | 3,347,985 |
| Surplus common stock in treasury | $4,152,015 |
| The fixed interest charge of the present company is annually | $577,130 |
| New company fixed interest charge first two years would be | $302,390 |
| New company fixed interest charge third and fourth years would be | $339,400 |
| New company fixed interest charge fifth year and thereafter | $400,000 |
| New company interest charged on income bonds, if earned annually | $60,560 |

"This plan leaves the bondholders and stockholders of the present company in the same relative position in the new company. The amount provided for the improvement of road and equipment will place it in first-class condition, reducing the percentage of cost of operation during the next few years. With the present business prospects, the road, relieved from payment of car trust notes and floating debt, can, for the ensuing year, earn and pay the interest on $2,000,000 prior lien bonds and on the outstanding general mortgage bonds, and, when good business conditions have brought back the coal tonnage handled by the old company in 1892 (962,000 tons), upon present rates it can earn an additional amount sufficient to pay the increased interest on its general mortgage and income bonds. That there will be a restoration to prosperous times in the near future is inevitable. Whether it will come next year, or later, no one can predict; but it is safe to assume that it will come within a few years, and with it not only a restoration of the old coal tonnage handled, but, with the present improved facilities, a larger business than the company has ever handled in its best years. With this plan carried out, and the company freed from floating debt and car trusts, and with a lower fixed charge ($302,390) for the next two years than any Ohio coal road, the property can be safely carried to such times as will bring a fair return to other securities.

"Exhibit B.

"Columbus, Ohio, June 11, 1895.

"Whereas, on or about July 1, 1895, it is proposed to incorporate and organize the Columbus, Sandusky & Hocking Railroad Company with a capital

stock which shall be at its organization, or shall be increased to, not exceeding eleven million six hundred thousand dollars ($11,600,000), of which capital stock not to exceed four million one hundred thousand dollars ($4,100,000) thereof shall be noncumulative four per cent. (4 per cent.) preferred stock, and the remainder common stock: It is also agreed that said company shall prepare and cause to be issued in accordance with law two million dollars ($2,000,000) of five per cent. (5 per cent.) five (5) year prior lien gold bonds, interest payable on October 1st and April 1st of each year. Also ten million dollars ($10,000,000) of fifty (50) year general mortgage gold bonds, which bonds shall bear interest as follows, to wit: Two and one-half per cent. (2½ per cent.) for the years 1896 and 1897, three per cent. (3 per cent.) for the years 1898 and 1899, and four per cent. (4 per cent.) thereafter until paid; interest payable on July 1st and January 1st of each year. Also one million five hundred and fourteen thousand dollars ($1,514.000) of four per cent. (4 per cent.) noncumulative fifty (50) year income gold bonds, interest payable on August 1st and February 1st of each year. All of said bonds to be a lien in the order stated upon the property of said railroad company owned at its organization, or at any time thereafter acquired. It is further agreed that said railroad company shall, in conformity with the laws of the state of Ohio, purchase and acquire all and singular the property now owned or hereafter prior to the conveyance be owned by the Columbus, Sandusky & Hocking Railway Company, and shall pay thereafter as follows, to wit:

"First. It will assume and pay the floating debt of said the Columbus, Sandusky & Hocking Railway Company, whatever the same may be, at the time of transfer of said property; assuming also the improvement of said property and equipment, not exceeding one hundred and eighty thousand dollars ($180,000), the cost and expense of its own organization, the payment of all car trusts of said the Columbus, Sandusky & Hocking Railway Company which it may owe at the time of said transfer; all of which several amounts not to exceed two million dollars ($2,000,000). The same to be paid from the bonds or the proceeds from the sale of the prior lien bonds heretofore mentioned.

"Second. It will pay from its general mortgage bonds to the present holders of the first mortgage bonds of the Sandusky & Columbus Short-Line Railway Company and the Columbus, Shawnee & Hocking Railway Company and to the outstanding equipment bonds of the Sandusky & Columbus Short-Line Railway Company and of the Columbus, Shawnee & Hocking Railway Company, the aggregate of all such bonds so outstanding being seven million four hundred and two thousand dollars ($7,402,000), as follows, to wit, the full face value of said bonds, less coupons due on the first day of January, 1896, in its general mortgage bonds. It will also deposit with the trustee of its general mortgage bonds sufficient of the same at ninety per cent. (90 per cent.) of their face value to retire or pay its two million dollars ($2,000,000) of prior lien bonds at their maturity.

"Third. It will pay the holders of outstanding consolidated bonds of the Columbus, Sandusky & Hocking Railway Company and outstanding coupons on first mortgage and equipment bonds of the said the Columbus, Shawnee & Hocking Railway Company and the Sandusky & Columbus Short-Line Railway Company to and including January 1, 1896, and interest on said consolidated bonds or other coupons to and including January 1, 1896, an aggregate not exceeding one million one hundred and twelve thousand dollars ($1,112,000) in said income bonds.

"Fourth. It will pay to the present holders of the preferred stock of the Columbus, Sandusky & Hocking Railway Company an equal amount in its preferred stock, to the holders of the common stock one share of its common stock for one share of their common stock. Said company will also assume the payment of two hundred thousand dollars ($200,000) of real-estate notes of the Columbus, Shawnee & Hocking Railway Company, and also eighty-nine thousand dollars ($89,000) of the Columbus, Shawnee & Hocking Railway Company coupon notes, and will deposit with the trustee of said bonds an amount sufficient at ninety per cent. (90 per cent.) of their face value of its general mortgage bonds solely for the purpose of exchanging for said real-estate notes and coupon notes, or selling the same to pay said notes at their maturity.

"Fifth. It is also agreed that whenever the holders of the majority of either issue of bonds above mentioned of the Sandusky & Columbus Short-Line Railway Company and of the Columbus, Shawnee & Hocking Railway Company or the Columbus, Sandusky & Hocking Railway Company shall have signed this agreement to sell their bonds on the terms above stated, or shall have delivered them to either or both George W. Sinks, trustee, at Columbus, Ohio, or to D. B. Hatch, trustee, at New York City, that then, and in that event, the said trustees shall demand the Metropolitan Trust Company, of the city of New York, trustee, named in the several mortgages securing the bonds above named, to at once proceed to foreclose either or all of said mortgages, and cause the property securing the same to be sold, and which property, when so sold, shall be purchased by Messrs. Sinks and Hatch, as said trustees, for the benefit of the parties who have agreed to make the sale of their securities as above set forth: and said trustees, upon the purchase of said property, shall immediately convey the same to the said the Columbus, Sandusky & Hocking Railroad Company: provided, further, that in the event of said bondholders of either of the companies above named, not having sold their said securities as herein agreed, shall be paid their pro rata share of the net proceeds arising from the sale of said property, as may be determined and fixed in said judicial proceedings. Any party hereto paying all or any part of such pro rata share shall be entitled to participate in this agreement to the same extent as if the securities representing such pro rata share had been deposited under this agreement. In order that all persons holding any of said securities may be treated alike, it is further agreed that any holder of said securities may consent to the sale or exchange as heretobefore set forth at any time thirty (30) days prior to the sale of said property in said judicial proceedings; but, in the event any party or parties shall fail to make said deposit or to sign this agreement for exchange prior to thirty (30) days before such sale, such parties shall be considered as not desiring to participate, but shall be construed as desiring to receive their pro rata share in money from such sale, whatever the same may be by the court determined.

"Sixth. It is further agreed, for the purpose of carrying out this contract, that said George W. Sinks, of the city of Columbus, Ohio, be, and he is hereby, appointed trustee for all bonds and stocks sold or exchanged at Columbus, Ohio, and D. B. Hatch, of New York City, for all bonds and stocks sold or exchanged at New York City; and it is further agreed that said trustees, or either of them, shall not in any wise be personally liable for any act done or performed by them, or any obligation incurred under this agreement, whatever the same may be, except for wilful neglect or gross misconduct. It is further agreed that either of said trustees, in the name of either of them, may issue certificates pending the carrying out of this agreement and the engraving and printing of said bonds and stocks calling for the bonds and stocks authorized under this agreement whenever the same may be so engraved and printed and ready for delivery by said the Columbus, Sandusky & Hocking Railroad Company. It is further agreed that this agreement shall be binding and effective whenever a majority of the first mortgage bonds of the Sandusky & Columbus Short-Line Railway Company and the Columbus, Shawnee & Hocking Railway Company or the Columbus, Sandusky & Hocking Railway Company shall have signed this agreement, or otherwise agreed in writing for the sale of their securities as hereinbefore specified.

"Seventh. It is further agreed that for the purpose of securing the ownership and control of the stock of the Zanesville Terminal Railway Company and the Columbus Terminal and Transfer Railroad Company there is hereby appropriated the sum of four hundred and two thousand dollars ($402,000) of the income bonds of said railroad company hereinbefore mentioned.

"Eighth. It is further agreed that any surplus of stock remaining after the payments as herein specified, and any bonds or their proceeds after the payments as herein stated, shall be subject to the order of the board of directors.

"Ninth. It is further agreed that said trustees may, if found necessary by them, for the purpose of paying maturing and past-due car-trust notes,

expenses of organization of new company, and taxes, pending the carrying out of this agreement, borrow such an amount as they may find necessary for that purpose, and to that end may pledge the securities owned by the parties signing this agreement, or deposited for any and all such loans. It is further agreed that any such money so borrowed, and the interest thereon, shall, by said trustees, be paid out of the proceeds of the sale of prior lien bonds before any other obligations are paid therefrom. The proceeds of the sale of said prior lien bonds shall be deposited in the name of George W. Sinks, trustee, in so far as necessary, for the following purposes, to wit: The paying of any moneys borrowed by said trustee, the car-trust notes of the Columbus, Shawnee & Hocking Railway Company, the car-trust notes of the Sandusky & Columbus Short-Line Railway Company, the floating debt of the Columbus, Sandusky & Hocking Railway Company, the cost and expenses of incorporating the Columbus, Sandusky & Hocking Railroad Company, the engraving and printing of its bonds and stocks, the legal expenses connected with the carrying out of this agreement. Any amount, either in bonds or the proceeds arising from their sale, remaining, shall be paid by said George W. Sinks, trustee, to the said the Columbus, Sandusky & Hocking Railroad Company on the order of its board of directors.

"Tenth. Upon the terms and conditions above stated, we, the undersigned, each for himself, hereby sells to George W. Sinks and D. B. Hatch, trustees, the amount of all bonds and stocks held by us.

| Name. | Address." |
|-------|-----------|
|       |           |

Nearly all of the bonds of the Railway Company, as well as those of its constituent companies, and nearly all of the stock of the Railway Company, were transferred to G. W. Sinks and D. B. Hatch, who thereupon requested the Metropolitan Trust Company, trustee under all of the then existing mortgages, to institute suit for their foreclosure. That trust company, in compliance with this request, filed a bill for the foreclosure of all five of said mortgages in the court of common pleas for Crawford county, state of Ohio. The only defendant to that suit was the Railway Company, which, by answer, confessed the averments of the bill in respect to its insolvency and default in interest upon each series of bonds, and consented to the appointment of a receiver and to a decree of foreclosure. A decree was accordingly entered appointing N. Monsarrat, receiver, who at once took possession and continued the operation of the railroad. A special master was appointed, and directed to report the indebtedness under the said five mortgages, and the order in which the indebtedness was secured. The master accordingly reported: First. That there was due under the first mortgage made by the Columbus, Shawnee & Hocking Railway Company the sum of $3,728,000 principal and $133,224.33 of interest on account of outstanding bonds secured by that mortgage, and that it was a first lien on that part of the railroad owned by the Railway Company, which had been originally owned by the mortgagor in said mortgage. Second. That there was due upon bonds outstanding secured by the second mortgage of the same constituent company the sum of $708,000 principal and $32,808.60 interest, which constituted a second lien on the property described therein. Third. That there was due upon bonds secured by the first mortgage made by the other constituent company, the Sandusky & Columbus Short-Line Railway Company, the sum of $3,000,000 principal, which constituted a first lien upon that division of the Railway Company's property described in said mortgage, and formerly the property of said mortgagor company. Fourth. That there was due $150,000 principal and $8,056.20 interest upon bonds secured by the said Sandusky & Columbus Short-Line Railway Company, which constituted a second lien upon the property of said railroad described in said mortgage. Fifth. That there was due $1,141,000 principal and $17,737.11 interest on account of bonds secured by the mortgage made by the defendant Railway Company

upon the entire line of its railway, which constituted a third lien upon each of its constituent divisions.

A decree of foreclosure was entered upon confirmation of this report, and a sale of the railroad ordered, first by separate divisions, and then as a whole. A minimum price of $750,000 was fixed upon each division, and $1,500,000 upon the property as a whole. The decree of sale, as finally modified and executed, directed that the purchaser should pay to the special master commissioner at the time of the purchase $5,000 in cash and $500,000 in the first lien bonds on the foreclosed divisional mortgages, divided equally between those which were first liens on the property of the two constituent companies, "or the equivalent of said bonds in cash at their par value." The decree further directed that: "The purchaser of said property shall pay such amounts in cash, or shall secure the same to be paid in a manner satisfactory to the court at such times as the court may order for the payment of, and all such liens as hereafter may be found to take precedence and have priority over, the liens of the several mortgages set forth in the petition herein. In the event said property shall be sold in separate parcels, then prior liens shall be by the court adjusted as may upon proper hearing be deemed just and equitable upon the property so in separate parcels sold. That, after the payment of such prior liens, the remaining amount of the proceeds of said sale may be paid to said master either in cash or bonds or coupons secured by the several mortgages as in said petition set forth. Each of such bonds or coupons as may be offered for payment as above mentioned shall be received in payment of any amount equal to the distributive share of the proceeds of said sale which the holder thereof would be entitled to receive as may hereafter by the court be determined. In the event that all of the balance of the purchase money after payment of prior liens is not so paid in bonds and coupons for sixty (60) days after such sale, then, and in that event, such remaining amount of the purchase price shall be paid in cash to the master, or secured to be so paid to the satisfaction of the court; and shall be by said master, when received, distributed pro rata to the owners and holders of said bonds and coupons as they may be respectively entitled."

The special commissioner duly reported a sale of the entire railroad, its rolling stock, equipment, etc., "to G. W. Sinks and D. B. Hatch, purchasing committee," at $1,500,500, who had paid in $5,000 in money and deposited $500,000 in first lien foreclosed bonds, as required by the decree of sale. The sale was confirmed November 4, 1895. The decree of confirmation, among other things, directed: First. That the special commissioner should, "by deed in fee simple," convey the said property to the purchasers, who "are hereby subrogated, for the protection of their title, to all rights in said premises that belong to holders of such liens or claims as may have been or may hereafter be adjudged in this action to be entitled to payment out of the proceeds of sale of said mortgaged premises." Second. That the receivers should immediately deliver possession to said purchasers, and that "upon entering this decree the clerk of this court shall cause to be entered upon the margin of the record of the mortgages described in the petition in each of the counties in which said mortgages are recorded a proper entry of the release of each and all of said mortgages." Third. In respect to the payment by the purchasers of the remainder of their bid the decree of confirmation included the following important provision, which, in its bearing upon the lien asserted for receiver's certificates issued by the Ohio court, is of the utmost importance: "And it appearing to the court that the amount and ownership of the claims against said the Columbus, Sandusky & Hocking Railway Company entitled to be paid out of the proceeds of said sale prior to the payment of the mortgage bonds described in the first, second, third, fourth, and fifth causes of action in the petition herein have not yet been reported upon by the referee heretofore appointed herein, or determined by the court, it is ordered that all questions in regard to the allowance and payment of the same be reserved for the further order of the court. And it is further ordered that, in order to secure the payment of the claims in the preceding paragraph mentioned when such payment shall be directed by the courts herein, said purchasers or their assigns, within ten (10) days

from the entry of this decree, and simultaneously with the delivery to them of the deed to the mortgaged premises, file with the clerk of this court mortgage bonds, or, pending the engraving of said bonds, bond scrip representing and exchangeable for bonds when they shall have been engraved. Said bonds shall be secured by a first mortgage on all the property hereinabove described, and shall constitute not less than two-fifths (⅖) of the entire issue of said first mortgage bonds, and shall bear interest at the rate of five per centum per annum from November 1, 1895. The said bonds shall be held by said clerk as security for the payment, out of the proceeds of said sale, and by the purchasers of said property, or their assigns, of such claims as may be ordered to be paid by this court prior to the payment of the bonds issued under the mortgages described in the petition, and especially and in the first instance for the payment of the excess of all costs, including allowances for counsel, and to said receiver and expenses of this suit over and above the sum of five thousand dollars ($5,000.00) paid to said special master commissioner, hereinafter mentioned, if there shall 'be any such excess. And it is further ordered that after the payment and satisfaction of all of said prior liens and claims to be evidenced by the production to the clerk of this court of receipts from the owners of said claims or cash, as the case may be, under and in accordance with the orders of this court, the persons who shall have deposited said bonds with the clerk aforesaid, or their assigns, may at any time, upon payment in cash, or upon presenting to the said clerk receipt as above provided, withdraw bonds so deposited at the rate of ninety per centum (90 per cent.) of their face value; that is, for every one thousand dollars ($1,000.00) so paid nine hundred dollars ($900.00) in bonds may be withdrawn. And it is further ordered that the balance of said purchase money in excess of the prior liens above mentioned and the costs herein shall be paid to said clerk, either in cash, or bonds, or coupons, secured by the mortgages in the petition described in accordance with the priority of the lien securing such bonds and coupons as heretofore determined; said bonds and coupons being, respectively, receivable in payment of purchase price of said property for an amount equal to the distributive share which the holders of each of said bonds and coupons shall be entitled to receive, as said share shall hereafter be found by the court; provided, that such payment, either in bonds, coupons, or cash, shall be so made within sixty (60) days from the date of this order."

A deed in fee simple reciting the payment of the full purchase money was made to the purchasers, Sinks and Hatch, and the release and satisfaction of the foreclosed mortgages was duly entered on the margin of the county records, as directed by the decree. The Railroad Company having in the meantime been duly organized, Messrs. Sinks and Hatch conveyed to it the said railroad so purchased by them as a "purchasing committee." This deed, among other things, includes a paragraph in these words: "Whereas, said Geo. W. Sinks and Daniel B. Hatch, as such purchasing committee, under an agreement dated June 11, 1895, and for the purpose of more fully carrying out said agreement, have executed, and by these presents do execute and deliver to the Columbus, Sandusky & Hocking Railroad Company, the following deed and conveyance."

The consideration for the deed is recited to be bonds and stocks of the Railroad Company issued to Sinks and Hatch, as follows: $7,402,000 of its general mortgage 4 per cent. bonds, $1,112,000 of said company's 4 per cent. income bonds, also $4,041,067 preferred and $3,347,985 of the common stock of said company. The deed expressly recites that the general mortgage and income bonds received are "subject to a first mortgage of two millions of dollars." The Railway Company, having thus acquired title, executed the two mortgages heretofore described, and now in course of foreclosure. The general 4 per cent. mortgage recognizes the priority of the $2,000,000 mortgage, and provides that the trustees shall hold 2,223 of the said general bonds for the purpose of exchanging same for the prior lien bonds, or selling same and applying proceeds to the payment of said prior lien bonds. That number of bonds have been accordingly held, though they have never been applied to the purpose intended. Messrs. Sinks and Hatch did deposit with the clerk of the Crawford county court of common pleas scrip repre-

senting and exchangeable for the prior lien bonds described in the decree confirming the sale to the extent of $800,000, as required by that decree. July 24, 1895, the said Ohio common pleas court, upon application of Monsarrat, receiver, authorized the issuance of receiver's certificates not to exceed $250,000, and October 7, 1895, authorized the further issuance of such certificates to the extent of $250,000. The entire issue, aggregating $500,000, are yet outstanding, and a lien for their security in preference to the mortgages is asserted by two of the interventions now under review.

The first order allowing these certificates is in these words: "This day this cause coming on to be heard, at chambers, before Hon. Allen Smalley, judge, on the application of the receiver of the defendant the Columbus, Sandusky & Hocking Railway Company, for authority authorizing the receiver herein to borrow money and issue certificates therefor as such receiver in an amount not exceeding the sum of $250,000, payable in gold coin of the United States of America not later than July 1, 1896, for the purpose of paying whatever amount may be due prior to the appointment of a receiver to the employés of said defendant while engaged in the services of said company, for taxes due by said company in the several counties along the line of said railway, for traffic balances, for supplies and materials used in and about the maintenance and operation of said railway, for car-trust obligations of July and August, 1895, for rentals of leased lines and terminal properties. The undersigned, having carefully examined said application, and heard the testimony offered in support thereof, and being fully advised in the premises, and having found that it is necessary to borrow said money, doth order that said receiver be, and he is hereby, authorized to borrow money for the purposes aforesaid, in such amount or amounts, and for such time or times, as he may find necessary, and shall issue his certificates therefor; which certificates, when issued for money so borrowed, or for payments of obligations aforesaid, shall bear interest at the rate of six per centum (6 per cent.) per annum, payable semiannually, and which certificates for money so borrowed shall mature not later than or before July 1, 1896, and shall be payable out of the earnings of said defendant while in the hands of the receiver first after the payment of costs in this case and its operating expenses, or out of the proceeds of the sale of said property, when the same is sold, first after the payment of the costs herein. It is further ordered that when said certificates are issued for money so borrowed, or in payment of any obligations above named, that the same shall be a first and prior lien upon all and singular the property of said defendant the Columbus, Sandusky & Hocking Railway Company now by it owned or hereafter by it acquired; provided, however, that the gross amount of money so to be borrowed by said receiver and certificates issued therefor shall not exceed the sum of $250,000, and provided that said certificates shall not be issued and sold at less than their face value."

The second is, in substance, identical with that set out above. No other or further sums have ever been paid into the said common pleas court by the purchasers of said railroad. From time to time, upon their application, the time for the payment of the purchase price in the mode prescribed has been extended, the last extension expiring July 1, 1897. February 3, 1896, the receiver, Monsarrat, was directed to pay to the Railroad Company $159,617.11, arising from sale of receiver's certificates. This order was in these words: "This day this cause coming on to be heard by the court, on the request of the receiver herein for an order as to the payment of certain (moneys) remaining in his hands from the proceeds of the sale of receiver's certificates heretofore, on the 7th day of October, 1895, authorized by the court to be issued, and the court, having examined the application of all the proceedings heretofore had herein, and being also advised that under the orders of this court the purchasers of the property here said moneys were borrowed, and also the certificates issued by said receiver: It is, therefore, by the court ordered that the said receiver deliver said moneys remaining in his hands, to wit, one hundred and fifty-nine thousand six hundred and seventeen and 21/100 ($159,617.21) dollars, from the proceeds of said certificates to the purchasers of said property or their assigns, and take their receipt therefor,

all liability on account thereof."

On October 10, 1896, Monsarrat, having made a final report of receipts and disbursements, was discharged, and his accounts passed. No report was ever made to the Ohio court as to the preferential debts and car-trust obligations which it was purposed to discharge with proceeds of receiver's certificates, though it appears that a considerable amount of such claims were paid off by Monsarrat out of the proceeds of his certificates. It also appears that the Railroad Company has also paid large sums upon such debts. Notwithstanding all such payments, it now appears that when these suits were begun, and the property of the railroad company placed in the hands of the present receiver, there were then outstanding claims secured by car trusts, or claiming preference as current operating expenses, or by reason of some form of special lien, aggregating more than one million of dollars, excluding the lien asserted for the Monsarrat certificates. It is proper, however, to say that probably not half of this sum consists of claims which the receiver was authorized to pay in preference to the mortgage debts. All of these claims are now to be considered, and their rank and lien determined.

W. O. Henderson, for floating debt creditors.

Henry T. Fay, John G. Carlisle, and J. F. Randolph, for Randolph committee.

Lawrence Maxwell, Jr., for Robinson.

C. C. Deming, for Mercantile Trust Co.

Herbert Parsons and Morrison R. Waite, for Metropolitan Trust Co.

Paul D. Cravath, for holders of receiver's certificates.

C. E. Burr, for Sinks.

R. R. Rogers, for prior lien mortgages.

Henry Crawford, for Monsarrat certificates.

Barton Smith, for Second Nat. Bank of Sandusky.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, having made the foregoing statement of the case, delivered the opinion of the court.

The following opinion deals with the several questions arising under a number of appeals by interveners and cross appeals by mortgagees set out in the caption. So far as found convenient, the questions under each appeal will be considered together, reference being always made to the statement of the case preceding the opinion for the general facts bearing upon the matter under consideration.

## No. 867.

### 1. Appeal of John G. Carlisle and others.

This appeal, shortly stated, involves the right of those who exchanged the bonds of the old bankrupt Railway Company and its constituent corporations for the general or second mortgage bonds of the new Railroad Company to rescind the reorganization agreement to which they were parties, and be reinstated in their rights, liens, and remedies against the property of the old mortgagor companies. If not entitled to full relief by entire and absolute rescission, they seek such relief out of the proceeds of the sale of the property of the Railroad Company as is equitably consistent with the rights of innocent third parties who have acquired liens in bona fide reliance upon the apparent title of the Railroad Company. The reorganization agreement between the different classes of bondhold-

ers and stockholders of the predecessor corporation the Columbus, Sandusky & Hocking Railway Company, herein called the "Railway Company," and its constituent corporations, provided, among other things, that a new corporation should be organized, to be known as the Columbus, Sandusky & Hocking Railroad Company, herein called the "Railroad Company," which should assume certain of the Railway Company's debts; and that the holders of the mortgage bonds which were a lien upon the property of the Railway Company would exchange their bonds for the general mortgage bonds of the Railroad Company, secured by a mortgage subordinate to an issue of $2,000,000 of bonds called "Prior Lien Bonds." It also provided that these prior lien bonds should be used in paying off the car trust liabilities and floating debt of the Railway Company, except $200,000, which should be used in paying organization expenses and in the improvement and equipment of the said Railroad Company's property. This agreement was assented to by all the holders of the bonds of the Railway Company and its constituent corporations, except by the owners of 29 bonds, who are unknown. The bonds of those assenting to the agreement were transferred to G. W. Sinks and D. B. Hatch, who thereupon, as provided by the agreement, required the Metropolitan Trust Company, trustee under all of the mortgages securing said bonds, to file a bill for their foreclosure. That trust company accordingly filed a bill against the said Railway Company in the common pleas court for Crawford county, Ohio, which resulted in a decree of sale. At said sale the entire property of said Railway Company was purchased by said Sinks and Hatch, who were described as a "purchasing committee." The sale was confirmed in fee simple, and deed made to said Sinks and Hatch as purchasing committee, and by decree of said court its clerk released and satisfied the lien of each of the foreclosed mortgages by proper entry upon the recorded mortgages in each county in Ohio where they had been recorded. The decree of confirmation further provided that the purchasers of said property should deposit with the clerk of said court $800,000, in bonds, or scrip for bonds, secured by a first mortgage upon the whole of said property; the whole amount of bonds to be secured by such mortgage not to exceed $2,000,000. The purpose and effect of this deposit will be considered in a subsequent part of this opinion. The said Sinks and Hatch, purchasers as aforesaid, thereupon conveyed, by fee-simple deed, the whole of said property to the Railroad Company, which had theretofore been organized, as provided by the reorganization agreement. The recited consideration for this last-mentioned deed was the general mortgage bonds, except such as were to be retained by the trustee to redeem prior lien bonds and certain real-estate notes and the income bonds and stock of said Railroad Company. The said Railroad Company, in accordance with the provision to that effect in said reorganization agreement, thereupon recorded two mortgages, —the first dated November 9, 1895, which secured an issue of $2,000,000 in "prior lien bonds"; the second was dated November 11, 1895, and secured an issue of $10,000,000 of bonds called "general mortgage bonds," which latter mortgage recited the execution and

priority of the mortgage securing the "prior lien bonds." The holders of the bonds of the Railway Company accepted from Sinks and Hatch these general mortgage bonds in exchange for the old bonds, and this completed the reorganization contract, except in so far as the prior lien bonds were to be used for the purpose of clearing away the car trust and floating debts of the old company, which were to be assumed by the new corporation.

Messrs. John G. Carlisle, Charles B. Henchman, and Joseph F. Randolph, as holders of more than one-third of the general mortgage bonds so accepted in exchange for the foreclosed bonds of the old predecessor companies, in behalf of themselves and all other holders of general mortgage bonds intervened in the court below for the purpose of asserting the lien and priority of the foreclosed bonds of the old mortgagor companies over all the liabilities, secured and unsecured, of the Railroad Company, including, of course, the lien of the two mortgages made by said company here in course of foreclosure, and executed in pursuance of their own agreement to that effect. This relief is sought upon the assumption that the committee, and those they represent, were the owners of the old foreclosed mortgage bonds, and parties to the reorganization agreement under which they received the bonds which they now hold. Upon this assumption, dimly averred, if averred at all, they pray to have their reorganization agreement rescinded, and to be reinstated in their liens and priorities as they existed prior to said agreement. Appellants say that, as between the parties to said agreement, the Railroad Company being regarded as one of them, they are entitled to its complete rescission, and to a reinstatement of the lien of their bonds as the prior liens upon the property of the Railroad Company. But they, concede that, so far as rights and liens have been acquired under the present foreclosure proceedings through the issue of receiver's certificates by order of the circuit court, or by innocent third parties, in reliance upon the apparent title of the present Railroad Company, that an actual rescission has become impossible. In view of this situation they insist that, when the court shall have given full effect to all prior rights which have been acquired bona fide under the present situation, the court shall recognize the right of these bondholders to rescission, and give effect to that right by decreeing them priority in the distribution of the proceeds of the sale of the railroad property as such priority existed prior to the reorganization agreement. Are the appellants entitled to rescission, absolute or partial? Unless they are, they must stand upon their rights as holders of the mortgage bonds of the present Railroad Company. This claim of a right of rescission is based upon the assumption that the sole consideration for their agreement to exchange their old bonds for the bonds of the new company, secured by a mortgage subordinate to one securing an issue of $2,000,000 of prior lien bonds, was that these prior lien bonds should be so applied as to pay off and clear away the car-trust obligations and the floating debts of the Railway Company, thereby protecting the security afforded by the general mortgage and rendering the Railroad Company a "solvent and going concern, with a chance of success-

ful operation in the future." It is then said that this "one purpose, which constituted" the sole consideration to the bondholders for consenting to the scheme of reorganization, was "impossible of performance," because, it is said, it was, and has ever since been, impossible to pay with $2,000,000 of prior lien bonds, consented to be set aside for that purpose, the car trust and floating debt of the old company. If we understand this proposition, it comes to this: If the debts assumed by the Railroad Company to be paid with the prior lien bonds devoted to that purpose exceed the sum which was or could be realized from the bonds, the consideration for the agreement fails, and the subscribing bondholders are relieved from all obligation to go on with the agreement, and are entitled to be reinstated in their original rights upon discovering that fact, although the contract has been executed in all its parts, including the extinguishment of the car trust and floating debts, so far as was possible.

It is difficult to deal seriously with this contention. There is neither a definite charge of legal fraud, nor evidence to show that fraud was practiced upon appellants to induce them to join in the plan for reorganization. That the expectation was that the debts assumed, called "car trust" obligations and "floating debts," did not exceed $2,000,000 is clear from a statement to that effect in the first clause of the agreement, as well as from the statement which was furnished the signers of that contract by the president of the Railway Company. That it was the intention and purpose that the prior lien bonds should be applied in payment of those claims is also plain. But that the validity and force of the contract was in any way conditional, or dependent upon the actual payment of all that class of claims with the proceeds of the prior lien bonds, is not a reasonable inference. The agreement amounts only to this: that the old property should be purchased by a new company, and that new securities should be issued for specific purposes. Even if a participant in that scheme might have been justified in refusing to surrender his bonds or take the new securities until he became satisfied with the arrangements for carrying out the plan, or that it could be carried out in its entirety, yet, when he did accept the new bonds, he accepted them subject to the business chance of failure, and to the possibility that there might be mistakes in the plan, or that the new company might not carry it out in all its parts. But we must remember that this agreement was one made between the bondholders of the old company for their own protection. It was not a sale by the old company of its property to the new company, the latter assuming to pay the debts of the vendor as part of the price. The old company was insolvent. A judicial sale was inevitable. This arrangement, although suggested by the officers and directors of the old company, was neither more nor less than an arrangement by the mortgagees of a bankrupt company to associate themselves together for their own protection. For this purpose they became the promoters of a new company, to be organized by themselves, and which for them, in their corporate character, was to acquire the mortgaged property, not from the Railway Company, but when sold under due foreclosure proceedings. It was not a scheme for refund-

ing the debt of the old company, and for its corporate continuance. Neither did the plan depend upon the assent of all the holders of mortgage debts. It was to become effective when assented to by a majority. The rights of those not assenting were not to be disturbed. The foreclosure would be for the benefit of all. Those who assented would accept the bonds of the new company in exchange for the bonds of the old company, and thus continue their investment in a new form; while the Railroad Company would receive the share of all such in the proceeds of the foreclosure sale, and apply it in payment of the purchase price which it should be required to pay as a purchaser. Those who did not assent to an extension and continuance of their obligations in the form provided by the cooperating arrangement would be entitled to their pro rata in the proceeds of the foreclosure sale distributable among the mortgagees. The plan was not strange, peculiar, or unusual, except in the fairness by which the benefit of the purchase at foreclosure was to be extended to the stockholders of the old company and to every class of creditors, secured and unsecured. This was done by a provision under which the new company provisionally undertook to assume and pay such debts in bonds reserved for that purpose, or in the proceeds of bonds, which it agreed to apply in their payment. In dealing with those who did assent, we must also remember that they apparently constituted the stockholders of the new company, as they did, seemingly, the stockholders of the old company. If there has been any mismanagement or departure from the plan and agreement, who is at fault? If it was the new company, to whom the protection of the new subscribers was intrusted, who is to hold it responsible for neglect, and upon whom is the punishment to fall? Surely not upon those who had no reason to know that there has been a misconception of the true condition of the old company, or that the new company was misapplying the powers with which it had been vested in respect to the carrying out of the plan of reorganization. Neither are we satisfied that the aggregate of the debts to be paid by prior lien bonds greatly, if at all, exceeded the estimate placed upon them. The inability to sell the prior lien bonds, and the unwillingness of creditors to take them at par, seem to have been the prime cause for the failure to pay off the debts they were intended to pay. That some of them were not appropriated for the purpose intended constitutes no ground for rescission, however it may affect the bonds so diverted. The greater proportion of the diversion consisted in the use of $118,000 for the purpose of paying interest upon the bonds held or represented by appellants. Whatever complaint may be made of this diversion by others who may have been affected, it certainly affords no ground for relief to those who benefited thereby.

The questions thus dealt with arose upon the face of the intervening petition, which was dismissed upon final hearing for want of equity and upon exceptions to the report of the master upon the liens resting upon the property of the Railroad Company. Though irregularly presented, except in so far as raised by the averments of the intervening petition, we have deemed it best to treat the

questions broadly, as did the court below. Among the exceptions taken by these appellants to the master's report was one to the allowance of interest upon coupons of prior lien bonds in the hands of the holders of the bonds. Each bond to which the coupons in controversy were attached, and from which they have never been separated, promises to pay the sum of $1,000 to the holder, "with interest thereon in like gold coin at the rate of 5 per centum per annum from the 1st day of November, 1895," interest payable on the first days of April and October of each and every year upon the presentation and surrender of the annexed coupons as they severally became due, and so long as the principal remains unpaid. When this action was brought the bonds had not matured, but they became due and payable October 1, 1900, and the principal of each bond bears interest from that date. The decree of the circuit court allowed interest upon the undetached matured coupons. This is excepted to upon the ground that the principal and interest is made payable in New York. The doctrine of the New York courts seems to be that interest upon interest is not allowed under the law of that state, but that an exception exists growing out of the character and purpose of interest coupons upon commercial obligations "when they become separate and independent instruments." In Williamsburgh Sav. Bank v. Town of Solon, 136 N. Y. 465, 32 N. E. 1058 (decided in 1893), it was held that, until they do, this exception from the general rule has no application. "When they do," said the court, "the exception is for the first time needed, and for the first time applies. Until they do, the promise is merely to pay interest, and is governed by the usual rule. They do not become separate and independent instruments until they are utilized as such."

In Bailey v. Buchanan Co., 115 N. Y. 297, 22 N. E. 155, 6 L. R. A. 562, the action was upon coupons attached to negotiable bonds. The court, speaking of the coupons, said:

"Until negotiated, or used in some way, they serve no independent purpose; and while they remain in the hands of the holder they remain mere incidents of the bonds, and have no greater or other force or effect than the stipulation for the payment of interest contained in the bonds, and while they remain in the ownership and possession of the owner and holder of the bonds it can make no difference whether they are attached to or detached from the bonds, as they are mere evidences of the indebtedness for the interest stipulated in the bond."

In City of Aurora City v. West, 7 Wall. 82, 105, 19 L. Ed. 42, 50, the action was upon matured coupons detached from negotiable bonds issued by an Indiana corporation, the place of payment not being stated, though, presumably, within the state of Indiana. They seem also to have been coupons in the hands of the owners of the bonds from which they were detached. Interest on the coupons was allowed without any discussion of the law of Indiana. The court, in respect to such obligations, said:

"Bonds and coupons like these, by universal usage and consent, have all the qualities of commercial paper. Coupons are written contracts for the payment of a definite sum of money on a given day, and, being drawn and executed in a form and mode for the very purpose that they may be separated from the bonds, it is held that they are negotiable, and that a suit may be maintained on them without the necessity of producing the bonds to which

they were attached. Interest, as a general rule, is due on a debt from the time that payment is unjustly refused; but a demand is not necessary on a a bill or note payable on a given day. Being written contracts for the payment of money, and negotiable because payable to bearer, and passing from hand to hand, as other negotiable instruments, it is quite apparent on general principles that they should draw interest after payment of the principal is unjustly neglected or refused. Where there is a contract to pay money on a day fixed, and the contract is broken, interest, as a general rule, is allowed; and that rule is universal in respect to bills and notes payable on time. Governed by that rule, this court, in the case of Gelpcke v. City of Dubuque, 1 Wall. 175, 17 L. Ed. 520, held that the plaintiff, in a case entirely analogous, was entitled to recover interest."

See, also, City of Cairo v. Zane, 149 U. S. 122, 13 Sup. Ct. 803, 37 L. Ed. 673, and Cromwell v. Sac Co., 96 U. S. 51, 24 L. Ed. 681, where interest on coupons was also allowed.

But in Mortgage Co. v. Sperry, 138 U. S. 313, 338, 11 Sup. Ct. 321, 329, 34 L. Ed. 969, 978, interest upon coupons was disallowed, following the law of Illinois, the obligations being payable in that state, and according to the law of that state. In reference to the law to be applied, the court said:

"Each contract of loan was made and was to be performed in Illinois, and each bond provides that it is to be construed by the laws of Illinois. Interest upon interest, as represented by the coupons, must, therefore, be allowed or disallowed, as may be required by the law of that state. In Illinois the whole subject is regulated by statute, and interest cannot be recovered unless the statute authorizes it."

This decision accords with the general rule that, in the absence of a stipulation to the contrary, the law of the place of performance will control in respect to the subject of interest. Miller v. Tiffany, 1 Wall. 298, 17 L. Ed. 540; Paley, Int. 187. The question of interest in New York is regulated by statute. 2 Rev. St. (Birdseye's 2d Ed.) p. 1695. We see no reason for not applying the doctrine of the case of Mortgage Co. v. Sperry, cited above, and holding that the law of New York applies. The decree, so far as it allowed interest upon coupons undetached and in the hands of the holders of the bonds, will be modified.

## 2. The Lien of the Floating Debt of the Railway Company.

This question arises upon the following appeals by interveners: No. 859. Appeal of John P. McCune. No. 860. Appeal of Edward K. Stewart. No. 863. Appeal of William P. Little. No. 864. Appeal of Charles Parrott and others. No. 862. Appeal of J. P. McCune, trustee, etc. In behalf of creditors holding claims of the class described in the reorganization agreement as "floating debts" of the old Railway Company, a general lien is claimed upon the property of the Railroad Company superior and prior to the two mortgages made by it. These debts were never liens upon the general property of the bankrupt company, and they only became liabilities of the present railroad corporation by reason of the provision in the reorganization agreement that the corporation to be organized should assume and pay the floating and car-trust debts of the old corporation. These creditors must, therefore, stand upon the agreement for the assumption of their debts found in that contract, or they

have no standing for the assertion of such a lien. But the very instrument which provides for the assumption of their unsecured debts by the new corporation also provides that the property of the old company, when acquired by the new, should be at once placed under two mortgages,—one to secure an issue of two millions of prior lien bonds, and the other an issue of general mortgage bonds; "all of said bonds to be a lien in the order stated upon the property of said Railroad Company." That agreement also provided that these floating debts should be paid by the new company by or out of these prior lien bonds. The second series of bonds were to be exchanged for the old bonds, bond for bond. The theory upon which this claim of lien rests is that the Railroad Company assumed the payment of these debts of the old company as a part of the consideration which it was to pay for its property, and that the assumption of these debts created a charge or equitable lien for their security upon the property purchased, which attached as soon as the Railroad Company acquired title under the deed of Sinks and Hatch. These appellants say this equitable lien existed before the execution of the mortgages under foreclosure, which were subsequently made with notice of this lien. In support of this position counsel cite and rely upon Clyde v. Simpson, 4 Ohio St. 445; Compton v. Railway Co., 45 Ohio St. 592, 16 N. E. 110, 18 N. E. 380; Hatry v. Railway Co., 1 Ohio Cir. Ct. R. 426; Railroad Co. v. Branch, 59 Ala. 139; and Hamilton v. Gilbert, 2 Heisk. 680. Clyde v. Simpson was an instance in which lands devised were held to be charged with the payment of legacies which the testator required the devisee to pay. Compton v. Railway Co. and Railroad Co. v. Branch were equitable liens resulting from statutory consolidations of railroad companies, the lien depending upon the construction and effect of statutes prescribing the terms of consolidation and providing for the assumption of the debts of the absorbed corporations. Hatry v. Railroad Co. was decided upon its special facts. The court found that the deed under which an equitable lien was asserted was made "in trust to carry out" the provisions of a reorganization contract, which, among other things, required the new company to pay the plaintiff's debt. The assumption of appellants' debts was not the result of any railway consolidation, nor were they imposed by any charter or statute. Not arising under any consolidation agreement or statutory provision imposing the debts of a selling upon the buying corporation, the lien claimed must depend upon general equitable principles, and arise out of the mere assumption of these debts by the new company as a term under a reorganization agreement, the nature and character of which we have considered in disposing of the appeal of John G. Carlisle and others.

We have already decided that the reorganization agreement under which the railroad company came into existence as the corporate representative of those who elected to pool their interests and unite in buying a property at an anticipated sale in which in one character or another they had interests, was not to be regarded as an agreement for the sale and purchase of a railroad wherein the purchasing company became primarily and absolutely liable for the debts of the sell-

ing company. If we are right in that conclusion, the obligation to these creditors must depend upon the contract which the promoters of the defendant railroad company imposed upon it; and a lien for their security, if they have any, must arise by fair implication out of the reorganization agreement. It is not contended for these appellants that the lien which they claim is strictly that which arises in favor of a vendor, and attaches to property sold, but a lien in the nature of a vendor's lien. But upon the analogies of a grantor's equity, assuming that the Railroad Company is to be regarded as a purchaser from some vendor competent to impose a lien for the security of the debts of a third person which the purchaser is to assume as a part consideration for property acquired, it will not be contended that it was not competent, fraud out of the way, for a vendor to require the vendee to assume and pay the vendor's debts, as part consideration for the property, without charging those debts upon the property sold. The equitable lien of a vendor will never arise, either in his favor or that of one to whom the purchase price is to be paid, contrary to the intention of the vendor. Mackreth v. Symmons, 1 White & T. Lead. Cas. Eq. (4th Ed.) pt. 1, 470–472, and cases there cited; Fisher v. Shropshire, 147 U. S. 133, 139, 13 Sup. Ct. 201, 37 L. Ed. 109; Adams, Eq. side pages 128, 129; Gilman v. Brown, 1 Mason, 191, Fed. Cas. No. 5,411; Whiteley v. Trust Co., 22 C. C. A. 67, 72, 73, 76 Fed. 74, 34 L. R. A. 303. Neither will an equitable lien or charge arise under any other executory agreement, will, grant, deed, or contract, unless an intention to create such a charge is inferable from the circumstances. Pom. Eq. Jur. §§ 1235, 1237. In Gilman v. Brown, cited above, Justice Story said, touching the principles upon which a vendor's equity rests, that "the rule is manifestly founded on a supposed conformity with the intention of the parties, upon which the law raises an implied contract, and therefore it is not inflexible, but ceases to act when the circumstances of the case do not justify such a conclusion." It is not, however, essential that there shall be an express reservation of a lien or an express charging of debts upon the property which is the subject of the dealing. "The form or particular nature of the agreement which shall create a lien is not very material, for equity looks at the final intent and purpose, rather than the form; and if the intent appear to give, or to charge, or to pledge property, real or personal, as security for an obligation, the lien follows." Pom. Eq. Jur. § 1237. The mere fact that one railroad company acquires the property and assumes the debts of another has been held not to create a lien for the security of the debts so assumed. Railroad Co. v. Ham, 114 U. S. 587, 597, 5 Sup. Ct. 1081, 29 L. Ed. 235; Fogg v. Blair, 133 U. S. 538, 10 Sup. Ct. 338, 33 L. Ed. 721. In Compton v. Railway Co., 45 Ohio St. 592, 621, 624, 16 N. E. 110, 121, 18 N. E. 380, the Ohio court declined to follow Railroad Co. v. Ham, saying that "in construing a statute of our own state [we] deem it our duty to adopt that construction which, in our judgment, most accurately expresses the intention of the legislature." The decision in Compton's Case was put upon a construction of the Ohio Statutes regulating the matter of consolidation of Ohio railroad corporations. An intimation that the same result might be reached upon the stipu-

lation in the consolidation agreement in respect to the debts of the constituent companies is contained in the opinion of Judge Minshall. But this is no part of the syllabus of the case, which, under a rule of the Ohio court, alone constitutes the decision of the court. There is certainly nothing in the Ohio decisions which controverts the proposition that an equitable lien will not arise under an executory agreement, which would be inconsistent with the plain intent and purpose of the parties.

Applying this principle to the case in hand, we find that the reorganization agreement, so far from contemplating a lien in favor of these creditors of the old company, expressly provided for the execution of a mortgage, which should be a first lien, and for the payment of these debts with these bonds or their proceeds. The argument that such a prior mortgage would not be inconsistent with an antecedent and paramount lien in favor of these creditors, but "a supplemental provision, not in derogation of the antecedent lien, but furnishing a method by which such antecedent lien might be extinguished," does violence to the plain meaning of the words of the reorganization agreement, and is utterly repugnant to the whole purpose and plan of reorganization. It was clearly intended that the new company should have the means of borrowing money with which to pay off these debts and others, as well as to make limited improvements upon its road. The lien now insisted upon would have made it quite improbable that the company could advantageously pledge its property. In re Brentwood Brick & Coal Co., 4 Ch. Div. 562, 565.

We have considered this question wholly apart from any question of fraud, for none has been suggested. Neither do these appellants attack the reorganization agreement or the foreclosure sale in pursuance thereof. Upon the contrary they confirm all that was done by their reliance upon the agreement to assume their debts. We do not understand these creditors as excepting to the decree in so far as it denied to them a lien upon either the first lien bonds or their proceeds. The Railroad Company did promise to use these bonds in part for the payment of their debts. But in part they were also to be used in the improvement and equipment of the railroad property. There was no separation of the bonds in such a way as that it could be said, "This bond is devoted to this use, and this to another." These creditors had nothing, except a promise, that these bonds, or their proceeds, would be used in part for the payment of their debts. Such an agreement did not operate as an assignment of the bonds to or in favor of these creditors. Christmas v. Russell, 14 Wall. 69, 20 L. Ed. 762; Dillon v. Barnard, 21 Wall. 430, 22 L. Ed. 673; Christmas' Adm'r v. Griswold, 8 Ohio St. 559. There was no error in denying to appellants either a general lien on the property or a special lien on the prior lien bonds.

The third assignment of error in No. 862, being the appeal of John P. McCune trustee, should be sustained so far as to place McCune, as assignee under labor claimants, upon the footing of the original parties. The preference attaching to a labor claim is to the claim, and not the claimant, and passes with the claim to an assignee. Trust Co. v. Walker, 107 U. S. 596, 2 Sup. Ct. 299, 27 L. Ed. 490;

Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596; Railroad Co. v. Lamont, 16 C. C. A. 364, 69 Fed. 23.

The decree is otherwise affirmed, as well as the decrees in each of the other causes considered in this section.

### 3. The Monsarrat Receiver's Certificates.

A prior and paramount lien to the mortgages made by the Railroad Company is asserted for the receiver's certificates issued by the Ohio common pleas court in the course of the foreclosure proceedings under which the Railroad Company obtained its title. These certificates were issued and sold by the court's receiver, N. Monsarrat, and aggregate $500,000, which, with interest since 1897, is due and unpaid. The Metropolitan Trust Company, complainant in the common pleas court foreclosure suit, became and is the owner and holder of these certificates to the amount of $250,000. The remainder were bought by the appellant F. G. Hallett. The lien asserted against the property of the Railroad Company was denied by Judge Taft in the circuit court, and from that decree the Metropolitan Trust Company, in its individual right, has prosecuted an appeal, which is docketed No. 908, and F. G. Hallett has separately appealed in a cause here docketed as No. 909. The history of the proceeding in the Ohio common pleas court, including the decrees and orders which bear upon the questions here presented, has been set out or stated in substance in the general statement heretofore made, and will not be repeated, except in so far as essential to clearness.

The contention that the lien of these certificates continued upon the property after the sale for foreclosure has no solid foundation upon which to rest. A decree for a sale had already been entered before these certificates were authorized, which plainly contemplated a sale of the property free from liens. Neither was there anything in the decree authorizing the certificates, and declaring that they should constitute a prior lien on the railroad, which precluded a sale of the property so charged, and a transfer of the lien to the proceeds of the sale; for the decree provided that they should be paid out of the earnings of the receivership next after costs and operating expenses, "or out of the proceeds of the sale of said property when the same is sold after the payment of the costs herein." Under the circumstances of this case, there were but two ways in which to provide for the payment of these receiver's debts. One was to sell the property subject to their payment by the purchaser. The other was to sell the property out and out, thus transferring all liens in favor of parties or privies to the proceeds of sale. To continue their lien as a burden which the purchaser was to assume in addition to his bid would require a distinct provision to that effect. This was not done. The original decree of sale was renewed with some modifications in respect to terms of sale, but the sale ordered was an out and out sale, a minimum price of $1,500,000 being fixed. To say that the purchaser agreed to pay the amount of his bid and to assume also these receiver's debts with no such terms stated in the decree would be a most unjust and erroneous conclusion. The pledge of the court in respect to the rank or lien of its receiver's debts upon the

property within the custody of the court was undoubtedly transferred to the proceeds of sale, and could only be fulfilled by the court in the distribution of the proceeds of sale. This conclusion is overwhelmingly strengthened by the terms and provisions of the decree confirming the sale and providing for the securing of a part of the purchase money by a deposit of the purchaser's mortgage bonds secured by a first mortgage upon the property against which these certificates had been originally issued. The retention of the lien of these certificates against the mortgage bonds to be deposited by the purchaser would be absolutely inconsistent with the security contracted for by the court. This will more fully appear when we come to consider the question as to the existence of a lien to secure the purchase money due from the purchaser. The true rule is that, where a sale is not expressly made subject to receiver's debts, the holders of such claims must depend for their ultimate rank and payment upon the final decree made in the cause wherein they were issued. Having obtained these claims pendente lite, they are privies, and affected by such subsequent decrees. This, upon elaborate consideration in an opinion by Taft, circuit judge, was the conclusion reached by this court in a case wherein it was sought to enforce the lien of such certificates against the purchaser. Mercantile Trust Co. v. Kanawha & O. Ry. Co., 16 U. S. App. 37, 7 C. C. A. 3, 58 Fed. 6. That case was followed in the circuit court of appeals for the Fifth circuit in Gordon v. Newman, 23 U. S. App. 660, 10 C. C. A. 587, 62 Fed. 686, where the opinion was by Circuit Justice White.

It is next said that, if the receiver's debts do not now constitute a lien upon the property against which they were issued because their lien was transferred to the proceeds of sale, the circuit court should have granted relief against the purchase money arising from the common pleas foreclosure sale; that, if the circuit court found that the purchase money agreed to be paid by the purchasers at that sale had not, in fact, been paid, it should, having the purchaser and the property before it, have granted to appellants such relief as the Ohio court might have granted upon petition filed therein by enforcing the lien of the purchase money against the property sold to the extent that such purchase price remains unpaid and is necessary to pay off the debts which were entitled to payment before the mortgage debts then foreclosed. If the property of the Railroad Company, now in the possession of the circuit court, was subject to any lien, contractual, statutory, or judicial, when it came into its possession, which could have been enforced against it in the common pleas court, it may be conceded that the rights and remedies of such lien creditors have not been lost, but may be enforced and made effective by the court now having exclusive custody of the property, and having the proper parties before it. Krippendorf v. Hyde, 110 U. S. 276, 4 Sup. Ct. 27, 28 L. Ed. 145; Gumbel v. Pitkin, 124 U. S. 131, 8 Sup. Ct. 379, 31 L. Ed. 374; Compton v. Jesup, 15 C. C. A. 397, 68 Fed. 263. Upon this theory we have considered the lien claimed for the Monsarrat certificates under the decree of the common pleas court authorizing their issuance. The theory now presented involves the fundamental question as to whether any lien exists upon the property of the Rail-

road Company for the security of the purchase price remaining unpaid to the Ohio court, which the court below should have enforced for the benefit of the holders of these receiver's certificates. The decree under which the common pleas court sold the property, now constituting the property of the Railroad Company in custody of the court below, provided that the minimum bid received should be $1,500,000; that the purchaser should pay to the commissioner $5,000 in money, and deposit with him $500,000 in first lien divisional mortgage bonds, or an equal amount in cash; and that the purchaser should pay such further amounts in cash, "or shall secure the same to be paid in a manner satisfactory to the court, at such times as the court may order for the payment of any and all such liens as hereafter may be found to take precedence and have priority over the liens of the several mortgages set forth in the petition herein." It further provided that:

"After the payment of such prior liens, the remaining amount of the proceeds of sale may be paid to said master, either in cash or bonds or coupons, at such distributive share as may hereafter, by the court, be determined."

It was evidently contemplated that the bondholders would, in their own interest, become the purchasers of the property. In that event it would only be necessary that cash enough should be paid into the registry of the court to pay expenses of foreclosure and such claims as should, in that cause, be decreed to be claims entitled to payment in preference to the foreclosed mortgage debts. These debts of the receiver were of that class, for the decree allowing the receiver to create them expressly declared that they should be paid next after the costs of the proceeding. Prior to the sale a special master had been appointed to take proof and report what debts existed to be paid in preference to the mortgage debts. This report had not been made when the sale came on to be confirmed, and no such report has ever been made to that court. The property was sold and bid in by G. W. Sinks and D. B. Hatch, as trustees for the mortgagees and stockholders of the bankrupt company, they having united in a plan for the acquisition of the property by a new company. Their bid was $1,500,500. They paid $5,000 in cash and "deposited" $500,000 in first lien foreclosed bonds. Having agreed to pay $1,500,500 for the property, it was manifestly within the power of the Ohio court, under the decree of sale, to require, if so much should be needed to pay off preferential debts,—including certificates issued by the receiver,—the payment of the whole of this sum. Pending the ascertainment of the preferential claims it was competent for the Ohio court to refuse confirmation until the amount to be paid in cash had been fixed and paid in, or to have confirmed the sale subject to a lien for the unpaid purchase money, or to have confirmed the sale and withheld a conveyance until the purchase money was paid, or to have made a conveyance reserving a lien or right to retake and resell in default of payment, when ordered. None of these things were done. The sale was confirmed. The commissioner was ordered to make a conveyance in fee simple, and "that the purchasers be, and they are hereby, subrogated for the protection of their title to all rights in said premises that belong to holders of such liens or claims as may

have been, or may be hereafter adjudged in this action to be, entitled to payment out of the proceeds of the sale of said mortgaged premises." The decree of confirmation, after reciting that the amount and ownership of claims entitled to be paid out of proceeds of sale before the mortgagees had not been ascertained, orders "that all questions in regard to the allowance and payment of the same be reserved for the further order of the court." Thus we find that the sale was confirmed, and the title in "fee simple" vested in the purchaser, without the reservation of any lien or right to retake and resell, although practically the entire purchase money remained unpaid. If the matter had stopped here, there would be strong ground for the insistence that an implied equitable lien would exist, which the common pleas court might have enforced against the purchasers and all who acquired title with notice that the purchase money was unpaid. But the decree did not stop there. The court and the counsel controlling the sale seemed to realize that some security ought to be exacted. The confirmation decree then proceeds as follows:

"Ordered that, in order to secure the payment of the claims in the preceding paragraph mentioned when such payment shall be directed by the court herein, said purchasers or their assigns, within ten (10) days from the entry of this decree, and simultaneously with the delivery to them of the deed to the mortgaged premises, file with the clerk of this court mortgage bonds, or, pending the engraving of said bonds, bond scrip, representing and exchangeable for bonds when they shall have been engraved. Said bonds shall be secured by a first mortgage on all the property herein described, and shall amount, in the aggregate, to $800,000, and shall constitute not less than two-fifths (⅖) of the entire issue of said first mortgage bonds, and shall bear interest at the rate of 5 per centum per annum from November 1, 1895. The said bonds shall be held by said clerk as security for the payment out of the proceeds of said sale, and by the purchasers of said property or their assigns, of such claims as may be ordered to be paid by this court prior to the payment of the bonds issued under the mortgages described in the petition, and especially, and in the first instance, for the payment of the excess of all costs, including allowances for counsel and to said receiver and expenses of this suit over and above the sum of five thousand dollars ($5,000) paid to said special master commissioner, hereinafter mentioned, if there shall be any such excess. And it is further ordered that, after the payment and satisfaction of all of said prior liens and claims, to be evidenced by the production to the clerk of this court of receipts from the owners of said claims, or cash, as the case may be, under and in accordance with the orders of this court, the persons who shall have deposited said bonds with the clerk aforesaid, or their assigns, may withdraw the same from his custody; provided, however, that the depositors of said bonds, or their assigns, may at any time, upon payment in cash, or upon presenting to the said clerk receipt as above provided, withdraw bonds so deposited at the rate of ninety per centum (90 per cent.) of their face value; that is, for every one thousand dollars ($1,000) so paid, nine hundred dollars ($900) in bonds may be withdrawn. And it is further ordered that the balance of said purchase money in excess of the prior liens above mentioned and the costs herein shall be paid to said clerk either in cash or bonds or coupons, secured by the mortgages in the petition described, in accordance with the priority of the lien securing such bonds and coupons as heretofore determined, said bonds and coupons being, respectively, receivable in payment of purchase price of said property for an amount equal to the distributive share which the holders of each of said bonds and coupons shall be entitled to receive, as said share shall hereafter be found by the court: provided, that such payment, either in bonds, coupons, or cash, shall be so made within sixty (60) days from the date of this order."

In pursuance of the authority conferred by this decree, a mortgage was made, simultaneously with the delivery of the master's deed, by the Railroad Company, "the assign" of Sinks and Hatch, securing an issue of $2,000,000 of 5 per cent. first mortgage gold bonds. Scrip, redeemable in bonds when engraved, to the extent of $800,000, was deposited with the clerk of the common pleas court. Bonds to redeem this scrip were placed in the possession of Sinks and Hatch, who now hold same, never having taken up the scrip in the hands of the common pleas clerk. Upon these facts we are unable to escape the conviction that the common pleas court intended to rely upon these bonds and the personal credit of the Railroad Company for the security of the receiver's certificates and other claims entitled to preference out of the proceeds of sale. That the court consented to the execution of "a first mortgage" for $2,000,000 by the purchaser is plain. That neither an express lien is reserved, nor jurisdiction to retake and resell the property for default in payment of deferred purchase money, is of no great importance, for it may be conceded that, unless relinquished, an implied lien in the nature of a vendor's lien would arise, and that the inherent powers of a court of general equitable jurisdiction would authorize it to enforce such implied lien by appropriate proceedings in the cause in which the sale was made. That any implied lien which might arise ordinarily to secure unpaid purchase money due under a judicial sale was intentionally relinquished in this instance, we entertain no doubt. To the fact that the court ordered a deed, vesting the title in fee simple, and that the purchaser should go at once into possession, and that for the protection of the title thus acquired they should be subrogated to the titles and liens of the holders of such liens before the court, we must add the pregnant circumstance that the court, for the express purpose of protecting such creditors as should be found entitled to preference over the mortgagees, exacted from the purchaser a particular security for the payment of the purchase price to the extent of $800,000. This security the court set apart for the benefit of preferential creditors, including therein, as the circuit court held, the holders of receiver's certificates. This security for the payment of the purchase price amply provided for the payment of so much thereof as then seemed sufficient to pay off receiver's debts and any other preferential claims not discharged by the proper application of the receiver's certificates. When we say that $800,000, secured by a first mortgage, seemed to afford an ample security for the payment into court of such part of the purchase price as should be necessary to pay off the claims entitled to be paid out of the proceeds of sale in preference to the mortgage debts, we include only preferential debts of the character which the receiver was authorized to pay out of the proceeds of his certificates, and do not include floating debts not paramount in equity to the mortgage debts, nor "car-trust" obligations, except in so far as the receiver was authorized to pay those matured, or about to mature, to save forfeiture of the equipment against which only were they a lien. But for the subsequent mistake of turning over to the Railroad Company, as assignee of the purchasers, $300,000 in receiver's assets, including over $150,000 in cash arising

from receiver's certificates, upon the theory that the purchaser had assumed the receiver's debts and all preferential liabilities, the security exacted by the court for the payment of purchase money would have been ample. The receiver and the complainant should have interposed, and applied these assets to the payment of preferred obligations. But the receiver had then become the president of the purchasing company, and had a degree of confidence in the sufficiency of its assumption of his debts, as well as of the debts otherwise preferential, not justified by the facts. The acquiescence of the Metropolitan Trust Company in this disposition of receiver's assets is more difficult to understand. What we have said as to the reasonableness of the security contracted for by the court is only significant as aiding us in understanding the intent of the court in the matter of retaining or relinquishing its equitable lien for the security of the purchase money. Was the particular security exacted from the purchasers consistent with the existence of a lien which was secret and yet paramount? Such a course was utterly repugnant to the retention of such a lien, and consistent only with an intention to rely upon the bonds to be deposited and the personal credit of the Railroad Company. Neither was this mortgage to be limited to securing only the 800 bonds to be deposited. By the express terms of the decree the bonds might be part of an issue not exceeding 2,000, secured by a first mortgage. The precise security which the court contracted for was given, and that security is inconsistent with the existence of any lien superior to it.

A first mortgage, upon these facts, implied a first lien, and every one looking to the title and acquainted with the history of that title had a right to believe that no implied vendors' lien was retained, and to accept bonds of any series thereafter issued in full reliance upon the freedom of the title from any secret lien. The relinquishment of the implied lien of a vendor has been inferred under circumstances less forceable than those here existing. In re Brentwood Brick & Coal Co., 4 Ch. Div. (1876) 562, is much in point. The owner of a brickyard and plant conveyed it to a corporation formed for the purpose of acquiring and operating it. The consideration for the transfer was £8,000; £2,000 to be paid in shares of the company, and £6,000 to be paid as follows: 50 per cent. of all sums of money received by the company or to be received by the company on the sale of shares, and the like sum of 50 per cent. upon all money by way of capital borrowed by the company until the payments so made should amount to the purchase price. The company sold no shares and borrowed no money, and proved abortive. The vendor asserted a vendor's lien, which was denied him. James, L. J., said:

"The case of the appellant may be a hard one, but the nature of the transaction excludes vendor's lien. This is not the case of a simple agreement to sell for £6,000. No doubt the vendor got a higher price by agreeing to accept payment in the way he did, and taking his chance of capital being subscribed or capital being borrowed to an amount to pay him. He says, in fact, 'Half of the first capital moneys that come in to the extent of £6,000 is to be my purchase money.' No day for payment was named. He agreed to receive his purchase money if and when capital should come in. He got for his property a charge upon and a right to the capital of the company to

the extent of £6,000 when it came in.   To my mind, it is clear that he intended to rely on that fund for payment, and intended that the company should have the means of borrowing.   This is quite inconsistent with a lien which would probably make the company unable to pledge their property. I am therefore of opinion that the vice chancellor came to a correct conclusion."

Much has been said by counsel about keeping the faith of the court in respect to the priority of debts created by its authority upon the faith of the property in its custody; to all of which we fully assent. But the court must also keep good faith with all those who deal with securities or property acquired in like reliance upon the verity of the proceedings of a court of record.   When rights in favor of third parties have arisen, the court, even in the enforcement of an order requiring the payment of purchase money under a judicial sale, should only exercise its authority in the enforcement of such order, consistently with such rights.   If the receiver, or others responsible for the management of the original foreclosure cause, have sacrificed the rights of this class of creditors, which might, by a different course, have been preserved, they must look to their remedies against those guilty of neglect.   Koontz v. Bank, 16 Wall. 196, 21 L. Ed. 465; Stuart v. Gay, 127 U. S. 513, 8 Sup. Ct. 1279, 32 L. Ed. 191.

All of the cases which have been cited by counsel to establish the power of a court over property sold at a judicial sale in the hands of third persons are cases where there was a distinct reservation of a lien, or a distinct reservation of a power to resell the property to compel compliance with the direction of further decrees in respect to obligations which the purchaser was bound to discharge, or cases where no intervening rights had arisen.   The confirmation decree, which relinquished the vendor's lien by providing for a special security inconsistent with the retention of a vendor's lien, was entered upon the motion of the Metropolitan Trust Company, the sole complainant in the Ohio foreclosure suit.   It at that very date was also the holder of $250,000 in receiver's certificates, for which it now asserts a lien, either through the lien declared when they were authorized, or through the enforcement of an implied vendor's lien. True, that company occupied two characters,—it was trustee for the foreclosing mortgagees, and, in its individual capacity, was the owner of one-half the receiver's certificates.   In neither character did it object to what was done, and, if others have acquired rights in reliance upon the relinquishment of the vendor's lien as a consequence of the confirmation decree, it is in no situation to complain if matters have turned out badly.   F. G. Hallett is in a somewhat better plight.   But he was one of the foreclosing mortgagees, and represented by his trustee.   We attach but a moral importance to this. He, as the holder of certificates issued pendente lite, was privy to the cause, and affected and bound by the decree which operated to transfer the lien of his certificates to the proceeds of sale, and to relinquish the vendor's lien for the special security provided by the deposit of the mortgage bonds of the purchasers.

Another effect of the confirmation decree in providing a particular security for the payment of claims prior in rank to the mortgagees is that the receiver's certificates must stand upon an equal

footing with the other preferential claims which it was the purpose of the Ohio court to protect and pay in preference to the mortgagees. This setting aside of a part of the proceeds of sale, covered by a particular security for the benefit of all within the equity of the order, operated to modify, to the extent of this part of the proceeds of the sale, the original provision that receiver's certificates should be paid out of proceeds of sale next after costs. This is peculiarly equitable, inasmuch as these holders of certificates interposed no audible objection to the transfer of $300,000 in receiver's assets to the purchaser upon its assumption of the receiver's debts, nor to the relinquishment of the implied vendor's lien. The 800 bonds held by the Ohio court are entitled to no preference over the other 1,200. The court only required that the 800 bonds should be part of a series not exceeding 2,000. It obtained the precise security contracted for, and the remainder of the series are equally entitled to the benefit of the mortgage securing all.

## 4. Real-Estate Mortgage Notes.

Notes aggregating $200,000, secured by a mortgage upon the shop property of the defendant Railroad Company at Columbus, are represented in these appeals by George W. Sinks, the trustee in the mortgage, as appellant from the decree which denied the Sinks mortgage priority over the prior lien mortgage to the Mercantile Trust Company; his appeal being docketed No. 861. The same noteholders are represented by Sinks, trustee, as appellee, in appeal docketed as 870, being an appeal by the Metropolitan Trust Company from the decree awarding the Sinks mortgage priority over the general mortgage to the Metropolitan Trust Company. To the proper understanding of the questions involved by these two appeals, it is necessary to state certain facts additional to those heretofore stated. The Sinks mortgage securing these notes rests upon 26.03 acres, situated in Columbus, upon which are the main shops of the defendant Railroad Company. This property was bought in February and March, 1890, in different parcels, by and for the Columbus, Shawnee & Hocking Railway Company, with the intent and purpose of putting the shops of that company upon it. For purposes not difficult to understand, the title was taken to W. S. Gray, then president and a director of the purchasing company. Gray was a naked trustee, the price being paid by the company, for whom the property was held. The company at once entered into possession, and constructed tracks and shops, and that company and its successors in the ownership have, since July 1, 1890, been in the open, notorious, and continued possession of same. While thus in the open, notorious possession of said property, W. S. Gray, at the request of the directory of the said Railway Company, on June 1, 1892, conveyed same to G. W. Sinks to secure 200 promissory notes of $1,000 each, made by the said Railway Company, being the notes referred to hereafter as the "real-estate notes," which are now outstanding and unpaid. When this shop property was acquired in 1890, the entire property of the said Columbus, Shawnee & Hocking Railway Company was subject to a mortgage to the Metropolitan Trust Company

to secure an issue of first mortgage bonds, of which $3,728,000 were outstanding. That mortgage had an after-acquired property clause broad enough to pass every subsequently acquired interest, real or equitable. After the acquisition of said shop property, and before the mortgage to Sinks, a second mortgage was made by the said Shawnee Company, which included its "machine shops," "real estate," "rights of way," "assets and estates, legal and equitable." This mortgage secured an issue of $708,000 of bonds. After Gray's mortgage to Sinks, Gray made a quitclaim conveyance of the property, subject to the Sinks mortgage, to the said Shawnee Company. Subsequently the Shawnee Company consolidated with another, forming the Columbus, Sandusky & Hocking Railway Company, the immediate predecessor in title to the defendant the Columbus, Sandusky & Hocking Railroad Company, which, for brevity, we have called the "Railroad Company." These two mortgages made by the said Columbus, Shawnee & Hocking Railway Company, called hereafter the "Shawnee Mortgages," were among those foreclosed in the foreclosure proceeding conducted by the Metropolitan Trust Company in the common pleas court for Crawford county, Ohio. The history of that foreclosure has been given in the general statement of facts. G. W. Sinks, as trustee, was not made a party to that proceeding, nor were any of the real-estate note holders brought in. Sinks, as trustee, was made a party defendant to both of the pending and consolidated foreclosure suits.

The lien upon the shop property of the two mortgages made by the Shawnee Company was superior in right to that of the Sinks mortgage. Though the title was in Gray, he was but a naked trustee. The equitable title was in the Shawnee Company, and passed under the after-acquired property clause of the mortgage existing when the property was acquired. This equitable interest also passed to the mortgagee under the mortgage made after its acquisition and prior to the mortgage to Sinks. The fact that the Shawnee Company was in the open and notorious possession of the property therein conveyed with its tracks and general shops, that the notes secured were made by that company, and that they were sold by it, and that it was subject to foreclosure upon its default, are circumstances abundantly sufficient to put the purchasers of notes secured thereunder upon inquiry as to the title of Gray, who was thus apparently and suspiciously but a nominal owner. Williams v. Sprigg, 6 Ohio St. 594; Zeller v. Bading, 43 Ohio St. 159, 1 N. E. 523; Shauer v. Alterton, 151 U. S. 622, 14 Sup. Ct. 442, 38 L. Ed. 286; Kirby v. Tallmadge, 160 U. S. 383, 384, 16 Sup. Ct. 349, 40 L. Ed. 463. If Sinks, as trustee, had been made a party to the Ohio foreclosure proceeding, his lien would have been subordinate to that of both of the mortgages made by the Shawnee Company. He was not, however, a party, and his lien has not been affected. He is an unforeclosed junior lienor. The purchaser at that foreclosure sale acquired the rights and title of the Columbus, Sandusky & Hocking Railway Company, which, through consolidation, included the rights and title of its constituent companies, one of which was the Columbus, Shawnee & Hocking Railway Company, the mortgagor in the

two mortgages foreclosed, which were senior to the Sinks mortgage.

All collateral questions out of the way, the Railroad Company is the equitable assignee of the two foreclosed Shawnee mortgages, which were senior in lien to the Sinks mortgage, and its mortgagees are entitled to avail themselves of those mortgages for the protection of their title against Sinks as an unforeclosed lienor, whose lien is apparently superior to that of the mortgages of the defendant Railroad Company. What, then, is the remedy and rank of Sinks as an unforeclosed lienor against one whose title is derived from a foreclosure proceeding to which he was not a party? The general rule is that the remedy of an unforeclosed junior mortgagee is to redeem from the senior mortgagee, or from a purchaser at a judicial sale to foreclose a senior mortgage to which the junior lienor was not a party, the purchaser in such case being regarded as the assignee of the foreclosed senior mortgage. Compton v. Jesup, 15 C. C. A. 397, 68 Fed. 263, 312; Jones, Mortg. § 1395. The law of Ohio, where the property here concerned lies, departs from this general rule, and permits such junior lienor to foreclose as if there had been no prior foreclosure, and permits him to be paid out of the surplus after paying to the purchaser the amount due upon foreclosed senior mortgages, treating him as subrogated to their rights. Stewart v. Johnson, 30 Ohio St. 24; Holliger v. Bates, 43 Ohio St. 437, 2 N. E. 841; Stewart v. Railway Co., 53 Ohio St. 167, 41 N. E. 247, 29 L. R. A. 438. But Sinks is not now seeking to foreclose or to redeem. He asks no affirmative relief based upon the theory that he is an unforeclosed junior mortgagee. The whole atmosphere of the case, including admissions of counsel at the bar, make it clear that the Shawnee division, upon which only the Sinks mortgage was a lien, would not, on resale, bring anything approaching the mortgage debt of which the purchaser is the equitable assignee, by virtue of its acquisition of the rights of the two mortgages senior to Sinks' upon that division. That a purchaser at a mortgage foreclosure sale acquires the rights, liens, and equities of the foreclosing lienors, and is to be regarded as the equitable assignee of such foreclosed mortgage or other liens, is indisputable. It is only when a foreclosure sale is defective in some particular that this doctrine of the equitable assignment of the rights of senior foreclosure mortgagees comes into play. If, for example, a junior lienor was not made a party, his lien is unforeclosed, and his rights are unaffected. His right to redeem, or, in Ohio, to have another sale for the enforcement of his mortgage, remains unaffected by the prior foreclosure. Stewart v. Railway Co., 53 Ohio St. 168, 41 N. E. 247, 29 L. R. A. 438.

In the determination of the relative right of such unforeclosed junior lienor to the rights of the purchaser, whether the junior lienor's right be limited to redemption or extended to another foreclosure, it becomes absolutely necessary to determine how far the purchaser acquired the rights of the foreclosed mortgages. Such a case is here presented. Sinks holds an unforeclosed mortgage embracing a part of the property included in the purchasers' mortgages now under foreclosure. As one holding a lien, he was properly made a party defendant, that his lien may be settled, and his rank as a lienor

adjudged. That he disclaims the status of a junior lienor, and insists that his lien has become senior, and as such entitled to be first paid out of the proceeds of the sale here sought, makes it all the more important that his precise status shall be determined. We do not understand that it is seriously contended that the lien of the Sinks mortgage was not junior to two of the mortgages made by the same mortgagor, and foreclosed in the proceeding under which the defendant Railroad Company acquired its title. Neither do we understand that it is denied that the purchaser at a mortgage foreclosure sale acquires, not only the title and right of the mortgagor, but the title and rights of the foreclosing mortgagees, and may rely upon such mortgagees' rights for the protection of his title against an unforeclosed junior mortgagee. The rule in Ohio is in accord with the general doctrine. Stewart v. Railway Co., 53 Ohio St. 151, 41 N. E. 247, 29 L. R. A. 438. While not disputing this general doctrine of subrogation, the counsel for Sinks have endeavored to take this cause without the rule upon the particular facts touching the acquisition of this railroad by the defendant Railroad Company. It is insisted that the foreclosure proceeding was but a mere step in the execution of the scheme for the reorganization, heretofore fully set out in the preliminary statement of this case. Counsel say that under that agreement the property of the old company was to be acquired by a new company, which, as a consideration for its acquisition, agreed to assume and pay the entire indebtedness of the old mortgagor company, including its mortgage bonds and the real-estate notes secured by the mortgage to Sinks. Upon this premise it is argued that the purchasing company became primarily and absolutely liable for every debt due by the old corporation, and that when it exchanged its bonds for those of the old company it thereby paid off debts for which it had become absolutely and primarily liable, the old company standing in respect to such debts only as a surety. If these premises be conceded, the defendant Railroad Company cannot be regarded as the equitable assignee of the foreclosed mortgages, for they have been extinguished. The effect of this would be to advance the lien of the unforeclosed and unsatisfied Sinks mortgage, so that it has now become the senior lien upon the shop property of the defendant Railroad Company. The principle upon which such a result is worked out is that, if one becomes the owner of an estate, subject to a prior charge, which he assumes and agrees to pay in part consideration for the property, he thereby becomes primarily liable for the debt so secured. The subsequent payment of a debt so assumed is the payment of the purchaser's own debt, whereby the mortgage for its security is merged or extinguished, and cannot by any device be kept alive as a means of fortifying his title against junior incumbrances. Pom. Eq. Jur. §§ 797, 1206, 1213. The attitude of appellant Sinks is peculiar. He says: "I am not bound by this reorganization agreement and the foreclosure sale which that agreement initiated. I was a party to neither." Yet he claims that under the reorganization scheme, to which he was not a party, and by which he is not bound, certain advantages have accrued to him which he now strenuously, and very

inequitably, insists shall be decreed to him. As a security, the Sinks mortgage was worthless. It stood behind mortgage debts largely exceeding the value of the division of which the shop property was but a part. The Railway Company, which had assumed these "real-estate notes," was utterly and hopelessly insolvent. Indeed, the bonded indebtedness, senior to Sinks, was confessedly a burden greater than the value of the whole railroad property of the Railway Company, to say nothing of an equal mortgage debt upon its short-line division. In this situation the reorganization agreement, which has so magically advanced the lien of the Sinks mortgage, was entered into. There is nothing in this reorganization agreement which particularly distinguishes it from the usual arrangement by which lien creditors of insolvent companies combine in their own interest, unless it be its unusual fairness to creditors holding subordinate liens and to those wholly unsecured. To no class of creditors was this arrangement more fair than to these "real-estate" note holders, for it provided that they should be paid in or out of the proceeds of the general mortgage bonds, thus putting them upon an equal footing with the readjusted mortgage debts senior to the Sinks mortgage. The agreement was not one with the old company, nor was it a party thereto. It was neither more nor less than an agreement between such holders of the mortgage bonds of the old company as were willing to unite for the protection of their interests as bondholders or stockholders in a bankrupt company. It was to become effective when a majority of the bonds had signed and agreed, but the privilege of sharing in its benefits was to continue until 30 days before the foreclosure sale then contemplated. Bondholders not assenting were to receive their pro rata share of the net proceeds arising from the sale under foreclosure decree. Manifestly, the parties to this arrangement did not expect or intend that bondholders who did not assent, or that junior mortgagees, such as these represented by Sinks, who should decline the arrangement made for them, would have their lien and security advanced by the exchange of old for new bonds, as provided by this plan. The intent plainly was not to release the mortgage debts which they held, but to continue the same in a new form, subordinate only to the mortgage for $2,000,000, the proceeds of which were to be used in discharging other indebtedness.

Much the same question arose in Mowry v. Trust Co., a case decided by the Seventh circuit court of appeals, and reported in 22 C. C. A. 52, 76 Fed. 38. In that case an agreement was entered into by nearly all the holders of certain classes of bonds issued by a railroad, by which they agreed to surrender their bonds, and receive bonds under a new and consolidated mortgage. Nearly all agreed to this plan. The new mortgage was made, and new bonds were accepted. The holders of certain bonds, who did not assent to this arrangement, claimed that the bonds other than their own had thereby been extinguished, and that they should be paid in advance of all who held under the new mortgage. "A court of equity," said Judge Jenkins, "would be slow to construe any agreement of reorganization so that it would work so inequitable a result." Upon

109 F.—14

all of the circumstances of the case the court held that the old bonds were not extinguished as between the assenting and nonassenting bondholders, but might be set up as against the nonassenting bondholders. Here there was no relation of vendor and vendee between the old and new company. The acquisition of the title of the mortgagor and the mortgagees was contemplated by the provision that a regular foreclosure sale should be brought about. In the decree of confirmation the purchasers and assignees were expressly vested with the rights of the mortgagees for the protection of their title. The subscribers to this reorganization did not undertake for the new company that it should become primarily and absolutely liable for the foreclosed mortgage bonds. The language of the engagement is that "it will pay from its general mortgage bonds to the present holders." This is only an agreement to "pay" in its bonds; that is, to give to each bondholder the option of taking in exchange a bond of the reorganized company. If he refused to accept such bond, he was driven to receive his pro rata of the proceeds of sale, for the new company does not undertake to become personally liable, even secondarily, to such nonassenting bondholders. Even "payment" does not always imply extinguishment. Redemption by a junior lienor is payment, but the obligations paid are kept alive if it is to the interest of the party paying for the protection of his own title against junior incumbrances. In Pom. Eq. Jur., the true rule is thus stated, in section 1211, as follows:

"Equitable Assignment by Subrogation. Under some circumstances, the payment of the amount due on a mortgage, when made by certain classes of persons, is held in equity to operate as an assignment of the mortgage. By means of the payment the mortgage is not satisfied, and the lien of it destroyed; but equity regards the person making the payment as thereby becoming the owner of the mortgage, at least for some definite purposes, and the mortgage as being kept alive, and the lien thereof as preserved, for his benefit and security. This equitable result follows, although no actual assignment, written or verbal, accompanies the payment, and the securities themselves were not delivered over to the person making payment, and even though a receipt was given speaking of the mortgage debt as being fully paid, and sometimes even though the mortgage itself was actually discharged and satisfied of record. This equitable doctrine, which is a particular application of the broad principle of subrogation, is enforced whenever the person making the payment stands in such relations to the premises or to the other parties that his interests, recognized either by law or by equity, can only be fully protected and maintained by regarding the transaction as an assignment to him, and the lien of the mortgage as being kept alive, either wholly or in part, for his security and benefit."

To operate as an absolute extinguishment of the debt of a third person, and for all purposes, the debt must, by a valid agreement, have become one for which the person paying has made himself absolutely and primarily liable. This rule is thus stated in section 1213, Pom. Eq. Jur.:

"On the other hand, if payment of the mortgage debt is made to the mortgagee or other holder of the mortgage by a party who is himself personally and primarily liable for the debt, who is in any manner and by any means the actual primary debtor, whose duty it is to pay the debt absolutely, and before all others, such payment operates ipso facto as an end of the mortgage, and the lien is completely destroyed. The party so paying is not subrogated to the rights of the mortgagee. There is no equitable assignment to

him of the mortgage security. Even if he should receive a formal assignment, the mortgage could not be thus kept alive, but would be wholly merged and ended."

The distinction is well illustrated by the case of Joyce v. Dauntz, 55 Ohio St. 538, 45 N. E. 900, where one who bought property subject to several prior incumbrances, but did not make himself primarily liable for their payment, paid for the protection of his own interest a prior lien thereon. In a controversy with a junior lienor he was held to be the equitable assignee of the claim so paid, and to have right to use it for the protection of his own title. To the same general effect are the cases of Patterson v. Birdsall, 64 N. Y. 294, 21 Am. Rep. 609; Cole v. Malcolm, 66 N. Y. 363; Twombly v. Cassidy, 82 N. Y. 155, 158; Railroad Co. v. Dow, 120 U. S. 287, 7 Sup. Ct. 482, 30 L. Ed. 595. The reorganization agreement must be construed in the light of the situation of the parties and the objects sought to be accomplished. The intent was not to relieve or extinguish existing mortgages securing the debts of the contracting bondholders except through due foreclosure, wherein, as purchasers, they might acquire the rights of the mortgagees for the fortification of the title. The debts of the existing mortgages were to be continued in a new form, under a mortgage which might call to its support the rights of the foreclosed mortgagees. Before a creditor, who is not bound by such a scheme for reorganization, should be accorded benefits to which he is not equitably entitled, a court of equity should require most unequivocal evidence that the new company, in giving new bonds for old, did so upon an agreement by which it had become primarily and absolutely liable for the old mortgage debts. The reluctance with which a court of equity will assist a nonassenting creditor to a fair scheme for the protection of the creditors of a bankrupt mortgagor company is well illustrated by the case of Stevens v. Railway Co., 8 Ch. App. 1064. In that case it appeared that a scheme for the arrangement of all of its debts had been made by a failing corporation. By that scheme prior lien creditors accepted one or the other of two new classes of securities. Stevens was a judgment creditor, who refused to consent, and contended that claims which had been prior to his own were postponed by the new arrangement, so that he was entitled to be first paid. Sir William James, L. J., said:

"If he is not in any way bound by the scheme, he ought not to be entitled to any benefit from that scheme. He is in the position of a person who, according to my view, is not entitled to read the scheme at all for any purpose. He says, 'I have nothing to do with the scheme.' If he has nothing to do with the scheme, he cannot claim the benefit from it. He is entitled to say, 'I shall insist upon my rights as if no such scheme had been made.' His utmost right, if no such scheme had been made, would have been to have said, 'When the mortgagees prior to me have been satisfied, I have a right to be satisfied.' And he has now no other right, unless it is given him by the scheme. Now, how has it been given him by the scheme? The mortgagees take under it, in place of their original securities for principal and interest, perpetual rent charges, which are legal rent charges enforceable by certain legal proceedings, independent of a bill in this court. I am of opinion in this case that, if the appellant says, 'I am not bound by that,' the answer is, 'Very well; then we will not allow anything more to be given to them than would have been given to them under the former ar-

rangement.' But he has no right to insist on having the legal rent charges which had been given to the mortgagees in satisfaction of their legal demand postponed to him for the purpose of giving him a priority to which he was not entitled at the time when the arrangement was made between the company and their creditors."

The contention that the Railroad Company and its mortgagee should not be permitted to set up the rights of the senior foreclosed mortgagees as against the priority of the Sinks mortgage because the Railroad Company, by the reorganization agreement, assumed the payment of the "real-estate notes" is equally unsound and inequitable. It is a mistake to say that the Railroad Company has made those notes its own absolute liability by the reorganization agreement. It only assumed their payment sub modo. The provision is in these words:

"Said company will assume the payment of two hundred thousand dollars ($200,000) of real-estate notes of the Columbus, Shawnee & Hocking Railway Company, and also eighty-nine thousand dollars ($89,000) of the Columbus, Shawnee & Hocking Railway Company notes, and will deposit with the trustee of said bonds an amount sufficient, at ninety per cent. (90 per cent.) of their face value of its general mortgage bonds, solely for the purpose of exchanging for said real-estate notes and coupon notes, or selling the same to pay said notes at their maturity."

This provision the holders of these notes have rejected. They are here saying, "We are not bound by that arrangement, and demand priority of payment as a result of the assent of all but ourselves." It is difficult to see how the appellants can claim an assumption of their debts under an agreement which they say does not bind them. If the assumption of payment has been made to the old company for a consideration moving from it, the case might be different. But this, as we have already shown, was a plan for a reorganization, which included only the assenting creditors and stockholders of the old bankrupt company. No one was bound by it except such as chose to assent to it, or accept the arrangements thus made for their benefit. Such arrangements, if just, should be upheld against the selfish schemes of those who seek to profit by the efforts and at the expense of others. Having refused to assent, the appellant ought not to obtain a technical legal advantage through which other creditors are to be postponed for his benefit. Crawshay v. Soutter, 6 Wall. 739, 18 L. Ed. 845; Stevens v. Railway Co., heretofore cited. We quite agree with the court below in holding that the Sinks mortgage has not obtained any priority by reason of the reorganization agreement.

It is next said that the general mortgage itself recognizes the real-estate notes as a lien superior, and that the general mortgage bonds include a reference of like import. Thus the bonds contain a recital in these words:

"This bond shall be and become a first lien upon the property securing the same upon certain payments being made or bonds exchanged, as provided for in the mortgage securing this issue of bonds."

The provision relied upon as a recognition of the priority of the Sinks mortgage is that found in the fourth paragraph of the mortgage, which is in these words:

'Sec. 4. It is further mutually agreed and understood between the parties hereto that upon the exchange or payment of the two million dollars ($2,-000,000) of the first mortgage bonds above mentioned, and the two hundred thousand dollars ($200,000) of real-estate mortgage notes above mentioned, that then and thereupon this indenture and the bonds secured hereby shall be and become the first and prior lien upon all and singular the property of the said the Columbus, Sandusky & Hocking Railroad Company hereinbefore described, or that may hereafter be acquired."

The "exchange or payment" of the prior lien bonds and the real-estate notes referred to in the paragraph quoted is that found in the preceding paragraph of the general mortgage, and is in these words:

"Sec. 3, (1) Bonds to the number of two thousand two hundred and twenty-three (2,223), numbered from one (1) to two thousand two hundred and twenty-three (2,223), both inclusive, shall be held by said trustee, and used for the purpose of being exchanged for or sold, and the proceeds applied to the payment of the two million dollars ($2,000,000) of outstanding first mortgage 5 per cent. bonds of this company at their maturity, or maturity of any extension of payment thereof. (2) Bonds to the number of two hundred and twenty-three (223), numbered from two thousand two hundred and twenty-four (2,224) to two thousand four hundred and forty-six (2,446), both inclusive, shall be held by said trustee and used for the purpose of being exchanged for or sold, and the proceeds applied to the payment of the two hundred thousand dollars ($200,000) 6 per cent. real-estate mortgage notes of the Columbus, Shawnee & Hocking Railway Company at their maturity, or the maturity of any extension of payment thereof. (3) The bonds above named and described shall be used for no other purpose than that named above: provided, however, that if, in the exchange or sale of said bonds, there should be a surplus of bonds remaining after the exchange or payment of the several items above named, or either of them, then, and in that event, such surplus bonds shall forthwith be delivered to the party of the first part on the order of its board of directors."

A vendee or mortgagee claiming under a deed or mortgage, which, on its face, recognizes an existing lien, charge, or incumbrance as of prior obligation, will thereby be estopped to deny the rank of the incumbrance so acknowledged. Bronson v. Railroad Co., 2 Wall. 283, 310, 17 L. Ed. 725; Jerome v. McCarter, 94 U. S. 734, 24 L. Ed. 136. But we do not agree with the circuit court in construing the statements found on the general mortgage bonds, or the so-called "admission" in the general mortgage itself, as a recognition of the superior rank of the Sinks mortgage. The granting clause of the mortgage very explicitly conveys every interest, legal and equitable, owned by the mortgagor in the property described. The Sinks mortgage was an outstanding unforeclosed lien on part of the property conveyed. In rank it was junior to two of the mortgages, of which, by subrogation, the Railroad Company was equitable assignee. But it was superior in rank to a third of the foreclosed mortgages, under which it held. It was, therefore, an unforeclosed intermediate lien. If the property upon which it rested should sell for enough to discharge the liens paramount in rank, it would be entitled to the surplus before the third mortgage, of which the mortgagor was also the equitable assignee. The language of the bonds and of the mortgage relied upon as conceding to this secondary lien a rank to which it was not equitably entitled must be construed in the light of the peculiar place which the Sinks mortgage actually held. In the light

of this actual status, it is noticeable that the supposed recognition of the paramountcy of that incumbrance appears only as an exception out of a covenant of the mortgagor in respect to the priority of the lien of the mortgage. The covenant, in substance, is that "this indenture and the bonds secured hereby shall be and become the first and prior lien upon all and singular the property of the said railroad company hereinbefore described," etc. But when? The covenant is in the future tense. It "shall be and become" such first lien when the prior lien bonds and the real-estate mortgage notes "above mentioned" are exchanged or paid in accordance with the provision made in the preceding covenant of the same mortgage. It is plain that the purpose was to limit the covenant in respect of the prior character of the lien of the mortgage by excepting out of it the two sets of obligations provided for in the preceding covenant, and to covenant that, when the "exchange or payment" there provided for shall occur, the indenture should then constitute a first lien upon "all and singular" the property conveyed. It imports no more than a refusal to covenant that the lien thereby granted should constitute an absolute first lien upon all of the property conveyed until the arrangement provided for by the reorganization agreement in respect to the exchange of general mortgage bonds for these real-estate mortgage notes, or their payment out of the proceeds of a definite number of such bonds to be set aside for that purpose, should be carried out through the trust created by the preceding covenant of the mortgage itself.

Reading the mortgage in connection with the reorganization agreement, and in the light of the actual intermediate character of the Sinks lien, we are unable to construe the alleged admissions of the mortgage as giving to that lien any status above that actually belonging to it. The case of Bercaw v. Cockerill, 20 Ohio St. 163, is much in point. That was a contest between two mortgages made the same day. The one recorded first was entitled to precedence under the statute, unless any exception found in its covenant worked a different result. The grantor covenanted that his title was clear and unincumbered, "except the mortgage interest of H. Palmer, this day perfected. Amount, $1,000." The Ohio court held that, as this covenant was one of warranty only, and not a reservation fund in the granting or habendum clause of the mortgage, it imported no more than a refusal to warrant the title against any lien resulting from the Palmer mortgage. The decree of the circuit court, holding the Sinks mortgagees entitled to priority of payment in the whole of the property of the Railroad Company over the general mortgage of that company, must be modified so as to limit its priority to the proceeds arising from the separate sale of the Shawnee division, after first paying to the general mortgagees the amount of the two senior mortgages upon that division, to which proceeds the general mortgage bondholders are entitled by subrogation.

The costs of the separate appeal by the Metropolitan Trust Company and of the separate appeal by Sinks, trustee, will be paid by G. W. Sinks.

## 5. The Zurhorst Lien, Cause No. 907.

The legal title to a portion of the Sandusky terminal property, included in the two mortgages under foreclosure, is in the appellant Ed. H. Zurhorst. In October, 1892, Zurhorst bought the property so held by him for the use of the Sandusky & Columbus Short-Line Railway Company, then in course of construction. He advanced the entire purchase money, and took the title to himself for his indemnification. A part of the price so advanced has been repaid, but he claims, and the circuit court so found, that there is still due him $5,379.90, with interest. This sum Zurhorst borrowed from the appellee the Second National Bank of Sandusky, and executed his individual note therefor. This note was renewed from time to time until July, 1893, when a note made by the Lake Erie Construction Company, for whom Zurhorst had acted in acquiring this property, indorsed by Zurhorst, was substituted. This latter note was renewed in October, 1893, by a like note made by said Construction Company, and indorsed by Zurhorst. In December, 1893, Zurhorst, to secure this note, executed a mortgage upon the property so standing in his name. The property so bought by Zurhorst was at once taken possession of by the said Sandusky & Columbus Short-Line Railway Company, and has ever since been included in the yards of that company, and its successors, in the ownership of said railroad. It was included in the mortgages made by the said Short-Line Railway Company, which was foreclosed in the common pleas foreclosure suit heretofore set out, and was also included in the two mortgages subsequently made by the defendant the Railroad Company. The master reported that there was still due Zurhorst $5,379.90, with interest, for purchase money advanced by him, and that the property was, in equity, subject to a prior lien for his reimbursement, and that the mortgage made by Zurhorst to secure the note of the Construction Company indorsed by Zurhorst operated as an equitable assignment to the bank of the equitable lien of Zurhorst. This report was confirmed, and the decree below provided for the payment of this liability as a prior lien. From this decree the two trust companies, as mortgagees of the Railroad Company, have appealed.

Zurhorst's claim must stand or fall upon the equities existing between himself and the old Short-Line Railway Company. All who subsequently acquired interests did so subject to constructive notice that the legal title to this particular part of the Sandusky terminal property was in him, and therefore charged with his equitable rights, whatever they might be. Appellants concede that Zurhorst had a lien for his protection for advances of purchase money made by him, but they say that the last of such advance was the money borrowed from the Second National Bank, and for which that bank held his individual note, and that, when that bank accepted, in place of his note, the note of the Construction Company, the debt of the Construction Company to Zurhorst for purchase money advanced by him for it was paid; that the effect of the arrangement was to pay to the bank Zurhorst's debt to it, and at the same time to extinguish the obligation of the Construction Company to Zurhorst.

This Construction Company was a corporation organized for the single purpose of constructing the Sandusky & Columbus Short-Line Railroad. Its contract was to acquire all necessary rights of way and terminals, and to construct its railroad. For this service it was to be paid in the mortgage bonds and stock of the Railway Company. The Construction Company, though a separate legal entity, was in fact but the alter ego of the Railway Company. It had no capital. Its officers and directors were officers, directors, and clerks of the Railway Company. Both companies were under a substantially common management and control, and the only purpose of its organization was to better enable the Railway Company to dispose of its stock and mortgage bonds. Zurhorst was a director and the secretary of the Railway Company. He was also the agent of the Construction Company for the procurement of rights of way and terminal property, which the Construction Company undertook to procure for the Railway Company. The substitution of the note of the Construction Company, indorsed by Zurhorst, for the individual note of Zurhorst, was never intended or regarded by the Construction Company or the bank as the payment of either the obligation of Zurhorst to the bank or of the Construction Company to Zurhorst. The liability of Zurhorst was continued. Its form was changed so that he appeared to be only liable secondarily. But this change in the form of the obligation was done to reduce his apparent liability as maker, so as to comply with the law, which prohibited a national bank from lending to one person a greater sum than 10 per cent. of its capital. Zurhorst, at the date of this substitution, appeared to be indebted in a sum in excess of 10 per cent. of the bank's capital. All parties understood the purpose of the arrangement, and any presumption of payment is rebutted by the facts and circumstances of the case.

But it is said that Zurhorst is estopped to assert his lien against the old Short-Line Railway Company. The facts which are relied upon to constitute an estoppel are substantially these. Shortly after the note of the Construction Company had been given to the bank, the Construction Company rendered to the Railway Company a statement purporting to be payments made by it subsequent to April 10, 1893, for "surplus real estate" turned over to the Railway Company, which aggregated $20,817.26. One of the items in the detailed statement was in these words:

"For yards and terminals at Columbus S. & C. Junction at Sandusky, Ohio, as per deed from E. H. Zurhorst to the Sandusky & Columbus Short-Line Railway Company, dated    3,246.27
                                                                     5,379.90
                                                                    ─────────
                                                                     8,626.17"

This statement was received, and a resolution adopted by the railway directors approving same, and directing that bonds and stocks be turned over to the Construction Company in settlement of the estimate. Zurhorst was present, and, as a director, voted for this resolution, and, as secretary, spread it upon the minutes. It is now said that Zurhorst should have then asserted that he had not been paid his advances, and had not made a deed, and thus pre-

vented the company from making a settlement with the Construction Company, based upon its claim to have paid Zurhorst for said property and its conveyance to the Railway Company. Ordinarily, such a state of facts would operate as an estoppel. Zurhorst says he did not know that the estimate submitted by the Construction Company included any such item; that a number of estimates had been submitted, and all had been approved by the company's engineer, and that he made no special inquiry. This defense of ignorance involves a confession of negligence in respect to his duties as director which would hardly absolve him, if, through his negligence, some real injury had come upon his corporation. But the master reports that nobody was misled by the estimate of the Construction Company or the silence of Zurhorst. The actual facts were at the time known to more than one of the directors present, including Col. F. J. Picard, vice president and general manager of the Railway Company. The truth is that the identity of the two corporations was so close, and they had so many common officials, that it is impossible to conceive how the Railway Company was misled, deceived, or injured by Zurhorst's silence, or by the payment of bonds made to the Construction Company upon their estimate. In the same bundle of papers was another exhibit, which showed that no deed had been made, and that Zurhorst had not been paid.

Under all the facts and circumstances the master was justified in his finding that the Railway Company was not ignorant of the real facts, and was not misled or deceived by the estimate of the Construction Company or silence of Zurhorst. The party relying upon silence as an estoppel must have been ignorant of the truth, and actually misled to his injury, before he can complain. To constitute an estoppel in pais, there must be shown some admission or conduct intended to influence the conduct or action of another, and which actually led him into a course prejudicial to his interests. If the Railway Company knew that Zurhorst had not been repaid his advances, and that the legal title still stood in him, it cannot say that Zurhorst's silence misled it into a line of conduct whereby it suffered a loss which would otherwise have been avoided. Neither is there evidence that any loss or injury actually occurred by the bond payment made on that estimate. The proceeds of those bonds appear to have been devoted to the use of the Railway Company in other matters, and so no loss resulted.

There seems to be a plain error in the matter of interest on this claim. Zurhorst's Exhibit F plainly shows that the discounts which he had paid upon his bank note up to October 1, 1893, form a part of this account there rendered, all of which he has received, save the amount due on his bank note. The decree will be modified so as to allow interest only from October 1, 1893. It was error to hold that Zurhorst's lien extended to the terminal property acquired from Frick. The decree will be corrected so as to confine the lien to 9.96 acres acquired from Marshall. The Second National Bank did not appeal. We cannot, therefore, consider the alleged error in respect to stopping interest on December 13, 1898. The bank must be regarded as acquiescing.

The costs of appeal in No. 907 will be paid by the appellant the Mercantile Trust Company.

### On Petitions for Rehearing.

(July 2, 1901.)

1. John G. Carlisle and those associated with him as holders of general mortgage bonds complain because the court has not, in its opinion, specifically dealt with alleged diversions of prior lien bonds, and have affirmed the decree of the circuit court holding that the entire issue of $2,000,000 of prior lien bonds had been negotiated for value to a large number of persons, who are now the lawful holders of same for value. The decree in that respect was based upon the report of the special master. In the opinion heretofore filed we dealt very fully with the general claim made in behalf of general mortgage bondholders that the reorganization scheme or agreement should be rescinded, and the original mortgagees reinstated in their rights under mortgages made by predecessor companies. We need not repeat what we then said in respect to the general validity of the prior lien mortgage. It is enough to say that we upheld that mortgage as a prior lien. The complaint now is that particular bonds secured by that mortgage may be held by persons who took them with knowledge that the railroad company was issuing them in violation of the reorganization agreement, and to the injury of general mortgage bondholders, who were interested in having them applied in clearing away liens prior to both mortgages, according to the provisions of the reorganization agreement. The presumption exists that all these prior lien bonds are in the hands of purchasers for value without notice of any violation of the reorganization agreement. The burden of proof was upon those who desire to defeat the lien of any particular bond. Murray v. Lardner, 2 Wall. 110, 17 L. Ed. 857. The master reported that all of said bonds had been regularly and lawfully issued, and were in the hands of bona fide holders.

The petition for rehearing complains of this finding and report, and points out certain bonds as bonds issued for purposes not contemplated by the reorganization agreement, and refers us to certain portions of the evidence heard by the master bearing upon this subject. It may be that, if the general mortgagees had acted with some vigilance, they might have prevented certain alleged diversions to their detriment. Instead of actively endeavoring to compel the railroad company to use the prior lien bonds for the purposes indicated by the reorganization agreement, the general mortgagees seem to have lain dormant. Indeed, we pointed out in our original opinion that they themselves had received such bonds in payment of interest upon their general mortgage bonds, and hence must have been aware that the railroad company was not strictly using the prior lien bonds as the reorganization agreement contemplated. The findings of fact by a master are supported by a strong presumption of correctness, and will not be set aside or modified in the absence of clear evidence of mistake or error. Camden v. Stuart, 144 U. S. 104, 12 Sup. Ct. 585, 36 L. Ed. 363; Lake Erie & W. R. Co. v. City of Fremont,

34 C. C. A. 625, 92 Fed. 721. The only exceptions to the report of the special master bearing upon the question as to the bona fide holding of the issue of prior lien bonds, interposed by Carlisle and others, are the tenth and twenty-second exceptions, which are in these words:

"(10) They also except to so much of said report as finds the fact to be that there has been no diversion of prior lien bonds, and say that the evidence before the master shows. the contrary to be true, viz.: The statement of application of prior lien bonds furnished by George W. Sinks, trustee, dated August 1, 1898."

"(22) They also except to so much of said master's report as finds as matter of fact that the entire issue of the Mercantile Trust Company bonds has been duly made for the principal sum of $2,000,000, and that they have been duly delivered, and that there is no opposing evidence, and say that the evidence before the master shows the contrary to be true, viz.: The statement of George W. Sinks, trustee, dated August 1, 1898."

These exceptions do not point out any particular bonds which have been "diverted," or which are not now held by purchasers for value without notice. The exceptions are vague, general, and insufficient under the rules of practice, and are insufficient to support the errors assigned thereon. Exceptions to a master's report must point out specifically the errors upon which the party relies. The object of such definiteness is to give the master an opportunity to see wherein his report is subject to objection, and to apprise the opposite party of just what he has to meet. Railway Co. v. Gordon, 151 U. S. 285, 14 Sup. Ct. 343, 38 L. Ed. 164. The exceptions, if good for any purpose, would operate as a denial of the right of each holder of prior lien bonds to share in the security of the prior mortgage, and require the court to hear the whole case upon all the facts affecting each bond and its present holder. The exceptions are manifestly insufficient to raise any question against any particular bondholder.

2. Attention is called to the fact that certain prior lien bonds were placed by the railroad company in the hands of George W. Sinks, as trustee, to be used in paying certain debts mentioned in the agreement under which the bonds were so placed, and that one term of that agreement was that the coupons on such bonds, maturing before the bonds should be disposed of for the purpose of the trust, should be cut off, canceled, and delivered to the railroad company. It does not sufficiently appear how far Sinks has complied with this agreement, nor how far he still holds bonds under said trust. The decree will be modified, so far as it provides for interest upon bonds held by said Sinks as trustee under said agreement, and the matter is remitted to the circuit court, with direction to ascertain what bonds are held by said Sinks under said agreement, and to deal with the matter according to justice and right.

3. The petition of G. W. Sinks, trustee, presents no new question, and the application to rehear is denied.

4. The petition of Carlisle and others for a rehearing is denied. The decree will, however, be modified as above indicated.